## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VoIP-Pal.Com Inc.;
*Plaintiff,*
v.
AT&T, INC.;
AT&T CORPORATION;
AT&T SERVICES, INC.;
SCOTT T. FORD;
GLENN H. HUTCHINS;
WILLIAM E. KENNARD;
STEPHEN J. LUCZO;
MARISSA A. MAYER;
DAVID R. MCATEE II;
MICHAEL B. MCCALLISTER;
BETH E. MOONEY;
MATTHEW K. ROSE;
JOHN STANKEY;
CYNTHIA B. TAYLOR;
LUIS A. UBIÑAS;

T-MOBILE USA, INC.;
ANDRÉ ALMEIDA;
MARCELO CLAURE;
SRIKANT M. DATAR;
SRINIVASAN GOPALAN;
TIMOTHEUS HÖTTGES;
DR. CHRISTIAN P. ILLEK;
JAMES J. KAVANAUGH;
RAPHAEL KÜBLER;
THORSTEN LANGHEIM;
DOMINIQUE LEROY;
LETITIA A. LONG;
MARK NELSON;
MIKE SIEVERT;
TERESA A. TAYLOR;
KELVIN R. WESTBROOK;

DEUTSCHE TELEKOM AG;
TIMOTHEUS HÖTTGES;
DR. FERRI ABOLHASSAN;
BIRGIT BOHLE;
SRINI GOPALAN;
CHRISTIAN P. ILLEK;
THORSTEN LANGHEIM;
DOMINIQUE LEROY;
CLAUDIA NEMAT;

CIVIL ACTION NO. _____

JURY TRIAL DEMANDED

1

VERIZON COMMUNICATIONS, INC.;
CELLCO PARTNERSHIP dba VERIZON
WIRELESS;
VERIZON SERVICES, CORP.;
VERIZON BUSINESS NETWORK
SERVICES, INC.;
VITTORIO COLAO;
SHELLYE L. ARCHAMBEAU;
MARK T. BERTOLIN;
ROXANNE S. AUSTIN;
MELANIE L. HEALEY;
LAXMAN NARASIMHAN;
CLARENCE OTIS, JR.;
DANIEL H. SCHULMAN;
RODNEY E. SLATER;
CAROL B. TOMÉ;
VANDANA VENKATESH;
HANS VESTBERG;
GREGORY G. WEAVER;

*Defendants*.

## **COMPLAINT**

# TABLE OF CONTENTS

**COMPLAINT**................................................................................................ **2**

**TABLE OF CONTENTS** .............................................................................. **3**

**PREAMBLE** .................................................................................................. **6**

**INTRODUCTION** ......................................................................................... **6**

**UNIFIED ANALYSIS: DRAWING PARALLELS BETWEEN THE GOOGLE ANTITRUST DECISION AND THE VOIP-PAL ANTITRUST COMPLAINT** ..... **11**

   A.   Introduction ........................................................................................ 11
   B.   Enhanced Comparison to Google LLC Antitrust Decision.................... 13

**THE DEFENDANTS' ANTICOMPETITIVE CONDUCT** ........................... **15**

   A.   Technical Feasibility of Standalone Wi-Fi Calling.............................. 15
   B.   Refuting Defendants' Claims Technical Infeasibility of Standalone Wi-Fi Calling and Texting Services ....................................................................... 17
   C.   Business Feasibility of Standalone Wi-Fi Calling.................................. 18
   D.   Wi-Fi Calling Business Feasibility and Antitrust Concerns ................. 18
   E.   Wi-Fi Calling Service Must Be Provided - Subscribers Are Being Gouged! ....... 19

**STATEMENT OF GRIEVANCES** ............................................................... **20**

   A.   Key Issues............................................................................................ 21
   B.   Legal and Market Implications............................................................ 21

**DEFENDANTS' BUNDLING PRACTICES AND ANTITRUST VIOLATIONS** ............... **22**

   A.   Bundle 1: Cellular Calling and Texting Tied to Wi-Fi Calling and Texting.... 22
   B.   Bundle 2: Cellular Calling and Texting Bundled with Wi-Fi Calling Services 23
   C.   Bundling Antitrust Violations ............................................................. 23
   D.   Impact on VoIP-Pal and Consumers ................................................... 25
   E.   Conclusion: The Legal Framework and Precedents ............................. 25

**DEFENDANTS' FRAUDULENT MISREPRESENTATION, DECEIT, AND MISLEADING CONDUCT** .................................................................... **27**

   A.   Fraudulent Misrepresentation ............................................................ 27
   B.   Deceitful Conduct .............................................................................. 27
   C.   Misleading Conduct ........................................................................... 28
   D.   Legal Precedents and Applications ..................................................... 28
   E.   Background and Basis for Antitrust Relief........................................... 29
   F.   VoIP-Pal's Technology Exposes Defendants' Anticompetitive Conduct ........... 30
   G.   Defendants' Anticompetitive Practices ............................................... 30
   H.   Impact on Vulnerable Populations and Innovation.............................. 30

I.   HARM TO VOIP-PAL FROM ILLEGAL DEPLOYMENT OF WI-FI CALLING ROUTING AND
     CLASSIFICATION TECHNOLOGY ..................................................................... 31
J.   RELEVANT PRECEDENT COURT CASES ............................................................. 32

**REQUEST FOR COURT CONSIDERATION: THE INTERPLAY OF ANTITRUST
     LAW AND PATENT LITIGATION ................................................................. 33**

A.   ANTITRUST BREACHES MUST TAKE PRIORITY OVER PATENT LITIGATION ...................... 33
B.   ANTITRUST LIABILITY PERSISTS EVEN WITH INVALIDATED PATENT CLAIMS .................. 34
C.   ANTITRUST LIABILITY EXTENDS BEYOND THE 20-YEAR PATENT TERM ......................... 34
D.   THE PRIMACY OF ANTITRUST LITIGATION OVER PATENT LITIGATION: A DETAILED
     ANALYSIS ................................................................................................. 35
E.   CONCLUSION ............................................................................................. 38

**THE PARTIES ...................................................................................................... 38**

A.   THE PLAINTIFF ......................................................................................... 38
B.   THE AT&T DEFENDANTS ............................................................................ 38
C.   THE T-MOBILE DEFENDANTS ....................................................................... 40
D.   THE VERIZON DEFENDANTS ......................................................................... 41

**VENUE SUITABILITY AND REQUEST FOR CONSOLIDATION ............................ 44**

A.   VENUE SUITABILITY ................................................................................... 44
B.   REQUEST FOR CONSOLIDATION ................................................................... 45

**STATEMENT OF THE CASE ............................................................................... 48**

A.   HARM CAUSED TO VOIP-PAL ...................................................................... 51
B.   SPECIFIC ALLEGATIONS .............................................................................. 51
C.   FACTUAL ALLEGATIONS .............................................................................. 52
D.   ANTITRUST VIOLATIONS ............................................................................. 53
E.   WEIGHING THE EVIDENCE ........................................................................... 53
F.   LEGAL PRECEDENTS ................................................................................... 53
G.   FTC AND DOJ POSITIONS ........................................................................... 55
H.   REQUEST FOR RELIEF ................................................................................. 55

**HIGH BAR OF TWOMBLY ................................................................................. 55**

A.   FACTUAL PLEADINGS .................................................................................. 56
B.   PRECEDENT CASES SUPPORTING PLAINTIFFS' FACTUAL PLEADINGS ....................... 57
C.   MEETING THE HIGH BAR OF TWOMBLY ......................................................... 58

**STANDING FOR VOIP-PAL AS PER ARTICLE III AND THE FEDERAL ANTITRUST
     LAWS OF THE SHERMAN AND CLAYTON ACTS ..................................... 58**

A.   STANDING OF VOIP-PAL UNDER ARTICLE III .................................................. 58
B.   PRECEDENT CASES SUPPORTING VOIP-PAL'S STANDING .................................... 59
C.   FEDERAL STANDING OF VOIP-PAL ............................................................... 61
D.   INCLUSION OF DEUTSCHE TELEKOM AG IN ANTITRUST COMPLAINTS: A NECESSARY
     COMPONENT .............................................................................................. 63

**PIERCING THE CORPORATE VEIL AND DIRECTORS' LIABILITY ...................... 64**

A.   ANTICOMPETITIVE CONDUCT AND FRAUDULENT MISREPRESENTATION ............................ 65
B.   JUSTIFICATION FOR PIERCING THE CORPORATE VEIL .................................................. 65
C.   PRECEDENT CASES ......................................................................................... 66
D.   WEIGHING THE EVIDENCE ................................................................................ 66

**COMPARATIVE ANALYSIS: UNITED STATES V. GOOGLE LLC AND UNITED STATES V. MICROSOFT CORP. AND THE VOIP-PAL ANTITRUST COMPLAINT ................................................................................... 67**

A.   OVERVIEW OF CASES ...................................................................................... 67
B.   COMPARATIVE ANALYSIS .................................................................................. 68
C.   WEIGHING THE EVIDENCE ................................................................................ 69
D.   CONCLUSION ................................................................................................. 70

**THE COUNTS ................................................................................................... 70**

A.   COUNT I: MONOPOLIZATION AND ATTEMPTS TO MONOPOLIZE (SHERMAN ACT §2) ....... 71
B.   COUNT II: TACIT COLLUSION (CLAYTON ACT §7) ................................................. 71
C.   COUNT III: RESTRAINT OF TRADE (SHERMAN ACT §1) ........................................... 72
D.   COUNT IV: TYING (CLAYTON ACT §3) ............................................................... 72
E.   COUNT V: FORCED SALE (CLAYTON ACT §3) ....................................................... 73
F.   COUNT VI: PRICE FIXING (CLAYTON ACT §2) ....................................................... 73
G.   COUNT VII: PREDATORY PRICING (CLAYTON ACT §2) ............................................. 73
H.   WEIGHING THE EVIDENCE ................................................................................ 74
I.   COMPARATIVE ANALYSIS OF SEVEN COUNTS: VOIP-PAL ANTITRUST COMPLAINT, THE GOOGLE CASE, AND THE MICROSOFT CASE ............................................................. 74

**DEMAND FOR JURY TRIAL ............................................................................... 77**

**PRAYER FOR RELIEF ....................................................................................... 77**

**CLOSING ........................................................................................................ 85**

## PREAMBLE

1.    AT&T, Verizon, T-Mobile, and Deutsche Telekom (Deutsche Telekom is the majority shareholder of T-Mobile US) (the "Defendants") have systematically violated antitrust laws for over six years by deliberately withholding standalone Wi-Fi calling services. Their anticompetitive practices—including tying arrangements, forced sales, and predatory pricing— have allowed them to maintain oligopolistic control over 97% of the U.S. smartphone mobile market. This deliberate conduct has definitively harmed VoIP-Pal, the sole Plaintiff in this complaint.

2.    **VoIP-Pal**: The primary and only Plaintiff, representing its interests as the owner of the Wi-Fi calling routing and classification technology that the Defendants have allegedly misused in violation of antitrust laws.

3.    The Defendants have engaged in anticompetitive bundling practices by tying Wi-Fi calling services to cellular calling and texting services. This practice has effectively prevented the emergence of a standalone Wi-Fi calling market, despite the clear technical feasibility of offering such services separately. Their bundling strategy serves to maintain the Defendants' market power and inflated pricing structures, violating Section 1 of the Sherman Act (unreasonable restraint of trade) and Section 3 of the Clayton Act (exclusive dealing and tying).

## INTRODUCTION

4.    This Antitrust case brought by VoIP-Pal is unprecedented, with evidence of antitrust violations by AT&T, Verizon, T-Mobile, and Deutsche Telekom being not only compelling but overwhelming. These Defendants, who control a staggering 373 million American subscribers and 97% of the U.S. mobile market, have systematically violated antitrust laws by refusing to

unbundle Wi-Fi calling services from their cellular offerings, thereby maintaining an unlawful stranglehold on the market.

5.     The significance of this case is underscored by its strong parallels to landmark antitrust cases, such as *United States v. Google LLC* and *United States v. Microsoft Corp*. However, this case extends beyond those precedents, involving violations of both Sherman Act Sections 1 and 2, and Clayton Act Sections 2, 3, and 7 by all four Defendants. The breadth and severity of these violations reveal a calculated effort to monopolize the market and suppress competition far beyond what was seen in the *Google* and *Microsoft* cases.

6.     The Plaintiff, VoIP-Pal, will demonstrate that the Defendants' strategy of bundling Wi-Fi calling services with cellular services is an egregious violation of antitrust laws. This practice not only mirrors but magnifies the anticompetitive behaviors condemned in the Google and Microsoft cases, as it builds a monopolistic barrier that stifles innovation, inflates consumer costs, and obliterates potential market entry for competitors.

7.     By filing this case in the District of Columbia, the same jurisdiction that delivered pivotal rulings in the Microsoft and Google cases, VoIP-Pal seeks to compel the Court to once again champion consumer rights and fair competition. The Defendants' conduct offers the Court a unique opportunity to redefine corporate accountability in an era where digital and telecommunications monopolies threaten to undermine the very principles of free market competition.

### 1.   Comparative Analysis: Defendants' Antitrust Violations Aligned with Five Landmark Precedent Cases

8.     The anticompetitive practices of the Defendants— demonstrate a comprehensive and systematic violation of antitrust laws, which not only mirror but extend beyond the breaches identified in five landmark precedent cases. Below is a detailed comparison of these practices against each

precedent case, highlighting the Defendants' violations and their alignment with the unlawful conduct condemned in these rulings.

9.  This Class Action Antitrust case is strongly supported by precedent antitrust cases, including:

    a)  **United States v. Microsoft Corp.** (2001).

        9.  **Court**: U.S. Court of Appeals, D.C. Circuit.

        10. **Exclusionary Dealings and Agreements:** Just as Microsoft was found guilty of using exclusionary practices to maintain its monopoly by tying its web browser to the Windows operating system, the Defendants have engaged in similar exclusionary dealings by bundling Wi-Fi calling and mobile data services with cellular services. This violates **Sherman Act Section 1** and **Clayton Act Section 3**, as these actions unreasonably restrain trade and limit competition.

        11. **Monopolistic Practices:** The Defendants' conduct parallels Microsoft's monopolistic control over the PC operating systems market, with the Defendants using their dominant position to suppress competition and maintain market control, violating **Sherman Act Section 2**.

    b)  **United States v. Google LLC** (2020, ongoing).

        9.  **Court**: U.S. District Court, District of Columbia.

        10. **Collusive Behavior:** The collusion between the Defendants to not offer standalone services echoes Google's exclusionary agreements in the search and search advertising markets, violating **Sherman Act Section 1** and

**Clayton Act Section 7**. This case highlights how modern tech giants can maintain market dominance through concerted efforts, similar to the Defendants' coordinated refusal to unbundle services.

11. **Tying Arrangements:** Like Google's exclusionary practices, the Defendants' tying arrangements force consumers into bundled services, violating **Sherman Act Section 1** and **Clayton Act Section 3**.

*c)* **Northern Pacific Railway Co. v. United States** (1958).

9. **Court**: U.S. Supreme Court.

10. **Tying Arrangements**: This Supreme Court ruling established that tying arrangements are per se illegal under **Sherman Act Section 1**. The Defendants' bundling of Wi-Fi calling and mobile data with cellular services is directly comparable, as it limits consumer choice and stifles competition, echoing the unlawful tying condemned in this case.

11. **Forced Sales**: The Defendants' forced sales tactics, where consumers are compelled to purchase bundled services, also reflect the anti-competitive behavior identified in the Northern Pacific Railway case, violating **Sherman Act Section 1** and **Clayton Act Section 3**.

*d)* **Eastman Kodak Co. v. Image Technical Services, Inc.** (1992).

9. **Court**: U.S. Supreme Court.

10. **Exclusionary Dealings and Forced Sales:** The Supreme Court in this case ruled that Kodak's tying of replacement parts to its repair services was

anticompetitive, even without initial monopoly power. Similarly, the

Defendants' exclusionary dealings and forced sales practices harm

competition and restrict consumer choice, violating **Sherman Act Section 1**

and **Clayton Act Section 3**.

11. **Predatory Pricing:** The Defendants' use of predatory pricing to eliminate

potential competition mirrors Kodak's restrictive practices, violating

**Sherman Act Section 2** and **Clayton Act Section 2 (Robinson-Patman**

**Act)**.

*e)* **United States v. Apple Inc.** (e-books case) (2013).

9. **Court**: U.S. Court of Appeals, Second Circuit.

10. **Collusive Behavior:** Apple was found guilty of conspiring with publishers to

raise e-book prices, a form of collusive behavior. The Defendants' collusion

to suppress standalone services reflects a similar violation of **Sherman Act**

**Section 1** and **Clayton Act Section 7**.

11. **Monopolistic Practices:** The collusion and resultant monopolistic practices

seen in the Apple case are paralleled by the Defendants' actions, which seek

to preserve their oligopoly and suppress competition, violating **Sherman Act**

**Section 2**.

### 2.  An Urgent Call for Judicial Intervention

10.     The Defendants' anticompetitive practices—including exclusionary dealings, collusive behavior,

monopolistic practices, tying arrangements, forced sales, predatory pricing, and the effects of

recent mergers and acquisitions—not only replicate but exceed the breaches identified in these

five precedent cases. These actions specifically harm VoIP-Pal by suppressing competition and preventing the company from offering its Wi-Fi calling solutions as standalone services.

11.  These anticompetitive practices are clearly demonstrated as parallel dealings to the five precedent cases, where court decisions have consistently condemned such behavior. The Court now faces an unprecedented opportunity to address these violations by holding the Defendants accountable under the Sherman and Clayton Acts. By doing so, the Court can restore balance to the telecommunications market, protect consumer rights, and set a global precedent for antitrust enforcement in the digital age. The Defendants' actions must be met with a decisive ruling that not only rectifies the specific harms in this case but also deters future anticompetitive behavior, ensuring that even the largest corporations adhere to the principles of fair competition.

## UNIFIED ANALYSIS: DRAWING PARALLELS BETWEEN THE GOOGLE ANTITRUST DECISION AND THE VOIP-PAL ANTITRUST COMPLAINT

### A.  Introduction

12.  In both the ongoing United States v. Google LLC antitrust case and the VoIP-Pal Antitrust complaint, defining the relevant market is central to understanding the alleged anticompetitive practices. Market definition plays a crucial role in determining the scope of monopolistic behavior and the potential harm to competition and consumers.

13.  In the Google case, the relevant market has been defined as the online search and search advertising markets. Google's dominance in these markets, through its extensive control over search engine results and the advertising ecosystem, is at the heart of the U.S. government's case. The argument is that Google has maintained and extended its monopoly by engaging in exclusionary practices, effectively stifling competition and harming consumers.

14.     Similarly, in the VoIP-Pal Antitrust complaint, the relevant market is the Wi-Fi calling and texting services market and its bundling with cellular calling and texting for smartphone subscribers. The complaint alleges that major telecommunications providers, including AT&T, Verizon, T-Mobile, and Deutsche Telekom, have conspired to monopolize this market by bundling Wi-Fi calling and texting services with traditional cellular calling and texting services, thereby preventing the emergence of standalone Wi-Fi calling and texting solutions and stifling competition. This case also highlights the Defendants' use of exclusionary practices and predatory pricing to maintain their dominant market positions, further limiting consumer choice and innovation.

15.     Both cases involve significant breaches of key antitrust laws, specifically the Clayton Act and the Sherman Act:

16.     **Section 2 of the Sherman Act**: This section addresses monopolization, attempted monopolization, and conspiracy to monopolize. Both Google and the Defendant telecommunications providers are accused of engaging in practices designed to maintain or achieve monopoly power, thereby restricting competition in their respective markets. The VoIP-Pal complaint specifically argues that the bundling of Wi-Fi calling and texting with traditional cellular calling and texting services, along with exclusionary practices and predatory pricing, are clear examples of this unlawful behavior.

17.     **Section 1 of the Sherman Act**: This section prohibits contracts, combinations, or conspiracies that unreasonably restrain trade. The VoIP-Pal complaint alleges that the Defendant telecommunications providers' bundling practices constitute an unreasonable restraint of trade by effectively forcing consumers to purchase services they may not need, thereby limiting competition from standalone service providers.

18. **Section 7 of the Clayton Act**: This section prohibits mergers and acquisitions where the effect may be substantially to lessen competition or to tend to create a monopoly. In the Google case, the government's argument extends to the company's practices that reinforce its monopoly in the search market. For the VoIP-Pal complaint, the focus is on the impact of recent telecommunications mergers and acquisitions, including T-Mobile's purchase of Sprint and the latest acquisitions by the Defendants of numerous Mobile Virtual Network Operators (MVNOs). These acquisitions have further consolidated market power, diminished competition, and restricted consumer choices in the market for Wi-Fi calling and traditional cellular services.

19. These cases exemplify how dominant market players can use their positions to engage in practices that undermine competition, violate antitrust laws, and harm consumers. The outcome of these cases will have far-reaching implications for how monopolistic behavior is addressed and regulated in both the digital and telecommunications sectors.

### B. Enhanced Comparison to Google LLC Antitrust Decision

20. The Google decision serves as a critical precedent in addressing monopolistic practices within the digital realm, emphasizing the court's proactive stance against exclusionary tactics that stifle competition. In a manner strikingly similar to Google's actions, the Defendants in the VoIP-Pal case have employed bundling strategies to entrench their dominance in the telecommunications market, thereby suppressing innovation and severely limiting consumer choice.

21. In the Google case, the court identified the harmful effects of exclusionary agreements that prevented competitors from gaining a meaningful foothold in the market. Similarly, the Defendants here have bundled Wi-Fi calling with cellular services, effectively eliminating the possibility of a competitive standalone Wi-Fi calling market. This practice not only mirrors the anti-competitive behavior condemned in the Google ruling but also exacerbates the situation by

targeting an essential service used daily by millions of consumers.

22. **Specific Consumer Harm**: The Defendants' actions have led to inflated costs for consumers, who are forced to pay for bundled services they may not need or want. This practice particularly disadvantages low-income populations, who are deprived of more affordable communication options that could otherwise be available through standalone Wi-Fi calling services. For instance, if standalone services were available, consumers could save an estimated X% per month, a significant financial relief that is currently being denied.

23. **Anticipating Counterarguments**: The Defendants might argue that bundling enhances service quality or is a standard industry practice. However, this justification falls flat when considering the broader market impact. Bundling artificially inflates prices and restricts consumer choice, with no substantial benefit to the consumer that outweighs the competitive harm. The Google decision rejected similar justifications, recognizing them as thinly veiled attempts to maintain market dominance.

24. **Broader Implications**: A ruling in favor of the Plaintiff would not only rectify the specific competitive harms in this case but also set a precedent for future antitrust enforcement in the telecommunications and technology sectors. Just as the Google decision reshaped the landscape for digital markets, this case offers the court an opportunity to establish critical protections for consumers and competitors in an increasingly monopolized industry.

25. The parallels between the Defendants' conduct in this case and the practices condemned in the Google decision are not just coincidental but indicative of a broader pattern of anticompetitive behavior that demands judicial intervention. By applying the same rigorous antitrust principles from the Google case, the court can restore fair competition in the telecommunications market and protect consumer interests.

26.     These anticompetitive practices are clearly demonstrated as parallel dealings to the five precedent cases, where court decisions have consistently condemned such behavior. The Court now faces an unprecedented opportunity to address these violations by holding the Defendants accountable under the Sherman and Clayton Acts. By doing so, the Court can restore balance to the telecommunications market, protect consumer rights, and set a global precedent for antitrust enforcement in the digital age. The Defendants' actions must be met with a decisive ruling that not only rectifies the specific harms in this case but also deters future anticompetitive behavior, ensuring that even the largest corporations adhere to the principles of fair competition.

## THE DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.  Technical Feasibility of Standalone Wi-Fi Calling

27.     The Defendants have engaged in a calculated scheme to deprive consumers of choice by forcing them to purchase unnecessary cellular services to access Wi-Fi calling. This predatory bundling strategy constitutes an illegal tying arrangement, flagrantly violating antitrust laws. Despite Wi-Fi calling being technologically independent of cellular services, the Defendants have cynically presented it as a "feature" of their plans, masking its potential as a standalone, cost-effective service. This deception allows them to maintain inflated prices while creating an illusion of added value. In reality, the primary beneficiaries are the Defendants themselves, who use Wi-Fi calling to offload network traffic and improve coverage without incurring additional infrastructure costs.

28.     This anti-competitive behavior not only harms consumers through artificially high prices but also stifles long-term innovation in the telecommunications industry. By suppressing the market for standalone Wi-Fi calling services, the Defendants are actively hindering the evolution of more diverse, flexible, and cost-effective communication solutions. Their actions represent a clear

strategy to limit consumer choice, maintain market dominance, and protect outdated business models at all costs. Swift judicial intervention is necessary to halt these practices, restore genuine competition, and safeguard consumer interests in the telecommunications market.

29.     There are no technical barriers preventing the Defendants from offering Wi-Fi calling and texting as a standalone service separate from cellular calling and texting. This practice effectively prevented the emergence of a standalone Wi-Fi calling and mobile data markets, despite the technical feasibility of offering such a service. The bundling strategy served to maintain the Defendants' market power and pricing structures violating Section 1 of the Sherman Act and Section 3 and 7 of the Clayton Act.

30.     **Protocol Independence**: Wi-Fi calling uses Voice over Internet Protocol (VoIP) technology, operating independently of cellular network protocols.

31.     **Infrastructure Autonomy**: Core network elements for Wi-Fi calling function separately from cellular infrastructure, enabling standalone operation.

32.     **Device-Level Implementation**: Smartphones have distinct components for Wi-Fi communications and cellular communications, enabling Wi-Fi calling and texting without cellular connectivity – a practice encouraged during international travel.

33.     **Network Agnosticism**: Wi-Fi calling operates on any IP network, independent of specific carrier networks, as evidenced by its use during international travel.

34.     **Over-the-Top (OTT) Precedent**: Existing OTT VoIP applications and softphone implementations conclusively prove the viability of standalone Wi-Fi calling.

35.     **Regulatory Compliance**: E911 services for Wi-Fi calling can be provided without relying on cellular location services, addressing key regulatory requirements.

36.     The preponderance of evidence unequivocally supports the technical feasibility of offering Wi-

Fi calling as a standalone service. Every critical component of Wi-Fi calling, from network protocols to device implementation, functions independently of cellular systems. The Defendants' bundling of Wi-Fi calling with cellular services is thus a deliberate strategy to maintain market control, not a technical necessity.

### B. Refuting Defendants' Claims Technical Infeasibility of Standalone Wi-Fi Calling and Texting Services

37.     The Defendants consciously chose to keep Wi-Fi calling tied to cellular and texting services, understanding that separating these offerings could disrupt their current pricing structure. By maintaining the bundle, they effectively discouraged subscribers from choosing a standalone Wi-Fi calling service, which would have been available at a much lower cost.

38.     **Existing VoIP Services**: Companies like Google Voice, Skype, TextNow, and WhatsApp already offer standalone Wi-Fi-style calling services, proving its technical feasibility.

39.     **Technical Capability of Defendants**: AT&T, Verizon, T-Mobile, and Deutsche Telekom possess superior telecommunications infrastructure and already support Wi-Fi calling when cellular service is unavailable.

40.     **Antitrust Implications**: The Defendants' bundling practices clearly violate Section 1 of the Sherman Act, which prohibits contracts, combinations, or conspiracies in restraint of trade. By tying Wi-Fi calling to cellular services, they engage in anticompetitive behavior designed to maintain their oligopolistic control over 97% of the U.S. smartphone mobile market.

41.     **Profit Motivation**: The Defendants' refusal to offer standalone Wi-Fi services protects their bundled sales and profits. This profit-driven strategy comes at the expense of consumer choice and affordability, particularly harming lower-income consumers who could benefit from more flexible, cost-effective options.

### C.  Business Feasibility of Standalone Wi-Fi Calling

42.　The Defendants strategically integrated Wi-Fi calling with cellular and texting services, fully aware that offering Wi-Fi calling as a standalone service would undermine their business model. By bundling these services, they sought to maintain higher subscription rates and prevent subscribers from opting for a more cost-effective, standalone Wi-Fi calling option.

43.　**Protecting Core Revenue**: Standalone Wi-Fi calling would cannibalize profits from traditional voice and texting plans.

44.　**Maintaining ARPU**: Bundling ensures customers continue paying for expensive full-service packages.

45.　**Preventing Competition**: Limiting standalone services inhibits potential competitors specializing in Wi-Fi calling.

46.　**Resisting Commoditization**: Bundling preserves carriers' market power and brand value.

47.　These practices prioritize profit maximization over providing customers with flexible, affordable options, effectively limiting consumer choice to maintain current business models and revenue streams.

### D.  Wi-Fi Calling Business Feasibility and Antitrust Concerns

48.　The Defendants maintained their service bundles, combining Wi-Fi calling with cellular and texting, as a strategic decision to safeguard their revenue streams. The Defendants were fully aware that offering Wi-Fi calling separately would lead to a potential exodus of subscribers from the more expensive bundled services. This practice leverages market power in cellular services to control the Wi-Fi calling market, limiting consumer choice and stifling innovation from:

　　*a)*  Illegal tying arrangement (Sherman Act, Section 1).

　　*b)*  Attempt to monopolize (Sherman Act, Section 2).

*c)* Exclusive dealing (Clayton Act, Section 3).

*d)* Creation of barriers to entry for potential competitors.

49. The bundling strategy lacks pro-competitive justification and constitutes an unfair method of competition (FTC Act, Section 5).

### E. Wi-Fi Calling Service Must Be Provided - Subscribers Are Being Gouged!

50. The Defendants strategically integrated Wi-Fi calling with cellular calling and texting services, fully aware that offering these services separately would undermine their business model. By bundling, they sought to maintain higher subscription rates and prevent subscribers from opting for more cost-effective, standalone options.

51. The Defendants consciously chose to keep Wi-Fi calling tied to cellular and texting services, understanding that separating these offerings could disrupt their current pricing structure. By maintaining the bundle, they effectively discouraged subscribers from choosing standalone services, which would have been available at a lower cost.

52. The Defendants' refusal to offer standalone Wi-Fi calling service constitutes clear antitrust violations:

#### 1. Sherman Act Violations:

53. **Section 1**: Tying arrangements forcing bundled purchases

54. **Section 2**: Monopolization of Wi-Fi calling market

#### 2. Clayton Act Violations:

55. **Section 3**: Exclusive dealing arrangements lessening competition

56. Bundling practices in the Wi-Fi calling mobile services industry result in inflated prices, reducing affordability and flexibility for consumers, particularly harming lower-income individuals who

are less able to bear the cost. These practices limit consumer choice by forcing customers to purchase comprehensive packages rather than selecting services that meet their specific needs. Additionally, such bundling stifles innovation and prevents new competitors from entering the market, thereby reducing the overall dynamism and competitiveness of the telecommunications sector.

57.    The Defendants' actions are purely profit-driven, prioritizing corporate gains over consumer welfare and technological progress. Their 97% market control allows them to artificially maintain high prices and restrict options.

58.    The Court must compel the Defendants to offer standalone Wi-Fi calling service to restore fair competition and protect consumer interests in the telecommunications market.

## STATEMENT OF GRIEVANCES

59.    The Defendants, AT&T, Verizon, T-Mobile, and Deutsche Telekom, have systematically engaged in anti-competitive practices that directly harm VoIP-Pal. By forcing consumers to purchase unnecessary cellular services to access Wi-Fi calling, these Defendants have implemented a predatory bundling strategy that constitutes an illegal tying arrangement, flagrantly violating antitrust laws. Although Wi-Fi calling is technologically independent of cellular services, the Defendants have deliberately concealed its potential as a standalone, cost-effective service, instead marketing it as a "feature" of their bundled plans. This deceptive practice enables the Defendants to maintain inflated prices and stifle market competition.

60.    This behavior not only harms VoIP-Pal by limiting its ability to partner with smaller carriers in a fair marketplace but also undermines innovation within the telecommunications industry. VoIP-pal cannot monetize on its Wi-Fi calling routing technology as long as the Defendants charge

zero for Wi-Fi calling.

61.     For over six years, these Defendants have exploited their market power to impose restrictive bundling practices that directly impede VoIP-Pal's ability to partner with potential competitor carriers and deploy its Wi-Fi calling routing classification technology for standalone Wi-Fi calling solutions. By forcing consumers into costly bundled services, the Defendants have created barriers that prevent VoIP-Pal from reaching its full market potential, thereby limiting the company's growth and innovation in the telecommunications sector.

### A.  Key Issues

62.     The fact that the Defendants do not offer unbundled Wi-Fi calling from cellular services, forces consumers into purchasing more expensive, full-service packages they may not need. This practice not only limits consumer choice and flexibility but also strategically undermines VoIP-Pal's ability to partner with other competitors and offer a more affordable alternative. VoIP-Pal's potential to facilitate the introduction of cost-effective solutions, such as standalone Wi-Fi calling services at an estimated cost of $6.50 per month, is directly threatened by these anti-competitive practices. Moreover, the inflated pricing strategies employed by the Defendants, such as charging an average of $240 per month for a family of four, contrast sharply with the potential value VoIP-Pal could provide at a fraction of that cost.

### B.  Legal and Market Implications

63.     The Defendants' antitrust violations and unfair business practices have not only restricted consumer access to affordable communication services but have also strategically targeted VoIP-Pal, a company with the capability to contribute in the advancement of the Wi-Fi calling technology. By perpetuating an environment that favors outdated, expensive bundled service, the Defendants are deliberately obstructing VoIP-Pal's entry into the market and its ability to offer

innovative, standalone Wi-Fi calling solutions. These actions represent a clear violation of antitrust laws, as they are designed to limit competition and entrench the Defendants' control over the telecommunications market.

## DEFENDANTS' BUNDLING PRACTICES AND ANTITRUST VIOLATIONS

64.   AT&T, Verizon, T-Mobile, and Deutsche Telekom (the majority shareholder of T-Mobile US) collectively control over 97% of the U.S. smartphone mobile market. Their business model mandates key bundles, eliminating consumer choice for standalone services by tying Wi-Fi calling to cellular calling and texting services.

### 1. Antitrust Concerns and Impact on Consumers

65.   These practices raise significant antitrust concerns and disproportionately impact vulnerable consumers.

### A. Bundle 1: Cellular Calling and Texting Tied to Wi-Fi Calling and Texting

### 1. Antitrust Violations

66.   **Tie-In Sales**: The compulsory bundling of Wi-Fi calling with cellular calling and texting services violates Section 1 of the Sherman Act and Section 3 of the Clayton Act.

67.   **Forced Sales**: The absence of standalone Wi-Fi calling options constitutes forced sales, violating Section 1 of the Sherman Act and Section 3 of the Clayton Act.

68.   **Price Fixing**: The uniform pricing of Wi-Fi calling at zero while bundling it with other services demonstrates price fixing, violating Section 1 of the Sherman Act.

69.   **Predatory Pricing**: Offering Wi-Fi calling at below-cost rates to force the bundle violates Section 2 of the Sherman Act.

70.   **Exclusive Dealing**: The absence of standalone Wi-Fi calling options demonstrates exclusive

dealing, violating Section 3 of the Clayton Act.

### 2. Impact on Consumers

**71.**  **Unfair Cost Shifting**: Subscribers pay twice for initiating Wi-Fi calls: a) Through their separate Internet service and b) Through higher, cellular-based prices for calling and texting.

**72.**  **Disproportionate Impact**: This practice harms vulnerable populations such as the elderly, nursing home residents, and economically disadvantaged individuals.

**73.**  This bundling strategy violates multiple antitrust laws while exploiting consumers, particularly those most vulnerable to such practices.

### B. Bundle 2: Cellular Calling and Texting Bundled with Wi-Fi Calling Services

### 1. Antitrust Violations

**74.**  **Tie-In Sales**: The mandatory bundling of cellular calling and texting services with Wi-Fi calling constitutes an illegal tie-in sale under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

**75.**  **Forced Sales**: The absence of standalone Wi-Fi calling options constitutes forced sales, violating both the Sherman and Clayton Acts.

**76.**  **Price Fixing**: The Defendants' pricing strategies for these bundles indicate coordinated efforts to maintain high market prices, violating Section 1 of the Sherman Act.

**77.**  **Predatory Pricing**: Offering these bundled services at below-market rates to suppress competition violates Section 2 of the Sherman Act.

**78.**  **Exclusive Dealing**: The bundling practices effectively prevent the availability of standalone Wi-Fi calling services, indicating exclusive dealing practices, violating Section 3 of the Clayton Act.

### C. Bundling Antitrust Violations

**79.**  The evidence overwhelmingly supports VoIP-Pal's claims of antitrust violations:

### 1. Sherman Act Violations:

80. **Section 1 (Restraint of Trade):** The Defendants—major telecommunications carriers such as AT&T, Verizon, T-Mobile, and Deutsche Telekom—are accused of engaging in practices that unfairly limit the ability of competitors to operate in the market. By tying Wi-Fi calling to cellular and texting plans, these companies prevent consumers from accessing standalone Wi-Fi calling services, which could be offered at a significantly lower cost. This behavior violates Section 1 of the Sherman Act, which prohibits contracts, combinations, or conspiracies that unreasonably restrain trade.

81. **Section 2 (Monopolization):** Monopolization occurs when a company uses its dominant market position to suppress competition and maintain its market dominance. The Defendants have used their control over essential telecommunications infrastructure to dominate the market for Wi-Fi calling. By tying Wi-Fi calling to other services and using exclusive dealing arrangements, these companies have engaged in exclusionary conduct designed to prevent competitors from gaining a foothold in the market. This behavior breaches Section 2 of the Sherman Act, which addresses monopolistic practices and attempts to monopolize any part of trade or commerce.

### 2. Clayton Act Violations:

82. **Section 2 (Barriers to Entry):** The Defendants engage in price discrimination that distorts the market and harms competition. Their zero-cost model for Wi-Fi calling when bundled, contrasted with the inability to purchase it standalone, constitutes illegal price discrimination.

83. **Section 3 (Exclusive Dealing):** The Defendants enter into exclusive dealing arrangements that substantially lessen competition. Their tying of Wi-Fi calling to cellular services effectively forecloses a substantial portion of the market to potential competitors.

84. **Section 7 (Tacit Collusion):** The Defendants' tacit collusion through parallel conduct in bundling

practices and pricing strategies has effects similar to an anticompetitive merger under this section.

85. **Price Fixing:** Price fixing, a violation of Section 1 of the Sherman Act, occurs when competitors conspire to manipulate prices. The Defendants are accused of collectively bundling Wi-Fi calling with cellular services at inflated prices, preventing the availability of standalone Wi-Fi calling services, and fixing the cost of Wi-Fi calling at zero despite the actual costs involved.

### D. Impact on VoIP-Pal and Consumers

86. These practices have widespread effects. Consumers are compelled to overpay for bundled services they may not need, while being denied access to affordable standalone options. The coordinated actions across major carriers point to collusion, maintaining artificially high prices and stifling competition. This directly harms VoIP-Pal by devaluing its Wi-Fi calling routing and classification technology, undermining its market potential. Ultimately, these actions create a market that restricts choice, hinders innovation, and preserves the Defendants' dominance at the expense of both consumers and potential competitors.

### E. Conclusion: The Legal Framework and Precedents

87. In **United States et al. v. Deutsche Telekom AG, T-Mobile US, Inc., SoftBank Group Corp., and Sprint Corporation**, the U.S. Department of Justice warned that the merger between Sprint and T-Mobile would significantly reduce competition in the wireless industry, limiting consumer choices and leading to higher prices. The DOJ expressed concern that reducing the number of major wireless carriers from four to three would harm the competitive landscape. Although the case was settled with conditions requiring the divestiture of certain assets to DISH Network, the government's intervention highlighted the risks of diminished competition and the potential negative impact on consumers in the telecommunications market. Unfortunately, today's reality reflects these concerns, as the merger has indeed led to reduced competition, fewer choices for

consumers, and the continued dominance of a small group of carriers in the market.

88. **United States v. Socony-Vacuum Oil Co.:** In this landmark case, the Supreme Court established that price-fixing agreements are per se violations of Section 1 of the Sherman Act. This precedent directly applies to VoIP-Pal's case, where the Defendants have engaged in anticompetitive behavior by bundling Wi-Fi calling with cellular services at inflated prices and preventing the availability of standalone Wi-Fi calling options.

89. **United States v. Microsoft Corp.:** The ruling against tying practices in this case supports VoIP-Pal's claims that the Defendants' bundling of Wi-Fi calling with cellular services constitutes illegal tying arrangements that stifle competition and limit consumer choice.

90. **United States v. Apple Inc.:** This case reinforces the illegality of price-fixing, paralleling the Defendants' coordinated pricing strategies for bundled services in VoIP-Pal's complaint.

91. **ZF Meritor, LLC v. Eaton Corp.:** The court found that exclusionary contracts violated antitrust laws. This ruling supports VoIP-Pal's claims that the Defendants' bundling practices and prevention of standalone Wi-Fi calling services create illegal barriers to entry and exclusive dealing arrangements.

92. These landmark cases collectively provide a robust legal framework for VoIP-Pal's antitrust claims against the Defendants' anticompetitive practices in the telecommunications industry. They support the argument that the Defendants' actions have significantly distorted the Wi-Fi calling market, harmed competition, and limited consumer choice through illegal price-fixing, tying arrangements, and exclusionary contracts. By applying these precedents to this case, VoIP-Pal establishes a strong foundation for challenging the Defendants' practices and seeking remedies to restore fair competition in the telecommunications market, reshaping the industry to benefit consumers and foster innovation.

## DEFENDANTS' FRAUDULENT MISREPRESENTATION, DECEIT, AND MISLEADING CONDUCT

### A.  Fraudulent Misrepresentation

93.  AT&T, Verizon, T-Mobile, and Deutsche Telekom, in their aggressive marketing campaigns, deliberately obscured the reality that Wi-Fi calling incurs additional costs for consumers, specifically through their home internet plans or public Wi-Fi usage. As industry leaders, the Defendants were fully aware of the underlying technology and the associated costs, making their misrepresentation not just misleading but knowingly false.

94.  The intent was clearly to induce consumers to use Wi-Fi calling more frequently, effectively offloading network traffic onto consumer-paid Wi-Fi networks. This strategy allowed the Defendants to reduce their infrastructure costs while simultaneously increasing data usage—and thus, revenue—from their customers. This discrepancy between marketing claims and actual costs not only harmed individual consumers financially but also distorted the entire market for telecommunications services, stifling potential competition and innovation in standalone Wi-Fi calling solutions.

### B.  Deceitful Conduct

95.  The Defendants engaged in a multi-faceted deception strategy, concealing material facts about Wi-Fi calling's data consumption and costs while exploiting consumers' limited technical knowledge. AT&T, Verizon, T-Mobile, and Deutsche Telekom breached their duty to provide full-service information, intentionally withholding crucial details to boost adoption at consumers' expense. Their deceptive bundling and misleading marketing emphasized benefits without explaining drawbacks, creating an environment where consumers couldn't make informed

decisions. This comprehensive approach manipulated demand and stifled potential competition in standalone Wi-Fi calling services, effectively distorting the telecommunications market to maintain their dominance.

### C.  Misleading Conduct

96.  The Defendants engaged in deceptive bundling practices by obscuring the true costs and benefits of their services, exploiting the technical complexity and consumer knowledge gap to their advantage. Through misleading marketing, they emphasized the benefits of their offerings while deliberately omitting or downplaying the associated drawbacks, leaving consumers with a distorted understanding of the services they were purchasing.

### D.  Legal Precedents and Applications

97.  **In re Vivendi Universal (2011)** established liability for materially misleading statements affecting market perception. This precedent directly applies to the Defendants' alleged misrepresentation about the feasibility of separating Wi-Fi calling from cellular services, strengthening our claim that they deliberately misled consumers and the market.

98.  **Titan Group v. Faggen (1975)** ruled that concealing material facts constitutes fraud when there's a duty to disclose. This supports our argument that the Defendants fraudulently failed to reveal the viability of standalone Wi-Fi calling, despite their duty to provide accurate information to consumers.

99.  **FTC v. Colgate-Palmolive Co. (1965)** determined that deceptive advertising influencing consumer behavior violates consumer protection laws. This precedent is relevant to the Defendants' alleged deceptive marketing of bundled services without disclosing standalone options, exposing them to liability under consumer protection statutes.

100. Collectively, these cases provide a robust legal foundation for VoIP-Pal's claims of fraudulent

misrepresentation and deceptive practices. They demonstrate that the Defendants' actions not only violate antitrust laws but also constitute fraudulent misrepresentation, strengthening our case for comprehensive remedies and additional liability.

### E. Background and Basis for Antitrust Relief

#### 1. VoIP-Pal's Innovation and Technology Deployment

101. VoIP-Pal.com Inc., through its wholly-owned subsidiary Digifonica International (DIL) Limited, began its groundbreaking work in telecommunications in 2005. Before seeking any legal protection, VoIP-Pal established four operational nodes—two in Vancouver, Canada, one in London, and another in Norway—demonstrating the commercial viability of its innovative Wi-Fi calling routing and classification technology. This technology, later protected by multiple U.S. patents, plays a central role in routing and classifying calls and texts over VoIP networks.

102. In addition to securing patents, VoIP-Pal faced 36 Inter Partes Review (IPR) challenges at the United States Patent and Trademark Office (USPTO) and survived every single one—a feat that is unprecedented. Winning just one IPR is a significant achievement in itself, but surviving 36 challenges underscores the strength and validity of VoIP-Pal's intellectual property and its determination to protect its innovative technology.

#### 2. Protracted Legal Struggles and Their Impact

103. Since securing its patents, VoIP-Pal has been engaged in relentless legal battles with major technology and telecommunications giants. These disputes have dragged on for more than eight years, with no resolution in sight. The ongoing litigation has placed a significant financial strain on VoIP-Pal, and the potential for any favorable judgment to be rendered moot by the expiration of the patents looms large. However, VoIP-Pal's technology remains critical to the market, particularly in exposing the Defendants' anticompetitive practices.

### F.  VoIP-Pal's Technology Exposes Defendants' Anticompetitive Conduct

104.    The Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom—have leveraged VoIP-Pal's Wi-Fi calling routing and classification technology without authorization. This unauthorized use has allowed them to maintain market dominance while hiding their anticompetitive practices. VoIP-Pal's technology has exposed these practices, revealing how the Defendants coordinated efforts to suppress competition and maximize profits at consumers' expense.

### G.  Defendants' Anticompetitive Practices

105.    **Offloading and Cost Shifting:** The Defendants have offloaded mobile traffic from their cellular networks to Wi-Fi networks, reducing strain on their infrastructure. This offloading increases network capacity without substantial investments, while allowing the Defendants to engage in anticompetitive behaviors like tying Wi-Fi calling to cellular services, forced sales, and predatory pricing. This burden is unfairly shifted to consumers, who pay for both Wi-Fi and cellular access, yet receive no financial benefits.

106.    **Market Control and Blocking Competition**: The Defendants monopolize the Wi-Fi calling market by bundling these services with cellular plans, effectively preventing competition from Over-The-Top (OTT) providers who could offer standalone Wi-Fi calling at lower prices. This strategy restricts consumer choice and prevents VoIP-Pal and other potential competitors from entering the market.

### H.  Impact on Vulnerable Populations and Innovation

107.    **Harm to Economically Disadvantaged Consumers:** Millions of economically disadvantaged individuals are forced to pay for bundled services they neither need nor want. These bundles are marketed as essential, leaving vulnerable populations with no choice but to incur unnecessary

expenses, further straining their limited financial resources.

108.    **Suppression of Innovation**: The Defendants' monopolistic practices severely stifle competition by creating barriers that prevent new entrants from entering the market. This reduces consumer choice and suppresses innovation, effectively shutting out competitors who could introduce novel, cost-effective solutions.

### I.    Harm to VoIP-Pal from Illegal Deployment of Wi-Fi Calling Routing and Classification Technology

#### 1.    Unauthorized Use of VoIP-Pal's Technology

109.    VoIP-Pal has suffered significant harm due to the unauthorized deployment of its Wi-Fi calling routing and classification technology by the Defendants. This illegal use infringes on VoIP-Pal's rights and has led to substantial financial damage, market devaluation, and barriers to forming partnerships.

110.    **Financial Damage:** The Defendants' misuse of VoIP-Pal's technology has resulted in significant financial losses, depriving the company of potential revenue and negatively affecting its market value and operational capacity.

111.    **Market Devaluation and Barriers to Partnerships:** By offering Wi-Fi calling services at no additional cost, the Defendants have devalued VoIP-Pal's technology, making it difficult for the company to charge reasonable fees or secure partnerships with smaller carriers who might otherwise be interested in adopting VoIP-Pal's technology.

#### 2.    Impact on VoIP-Pal's Business Model and Innovation

112.    The Defendants' actions have severely disrupted VoIP-Pal's business model, which relies on revenue from partnerships and licensing fees. The zero-cost bundling strategy employed by the Defendants has made it difficult, if not impossible, for VoIP-Pal to compete effectively, stifling

the company's ability to innovate and remain competitive in the market.

### 3. Competitive Harm and Market Distortion

113.  The monopolistic practices of the Defendants have broader implications for market competition and consumer choice. By monopolizing the Wi-Fi calling market, the Defendants prevent other companies, including VoIP-Pal, from succeeding in the market. This lack of competition limits consumer choice, leading to higher prices and fewer options.

### 4. Legal Breaches Impacting VoIP-Pal

114.  The Defendants' actions violate several sections of antitrust law, directly harming VoIP-Pal.

115.  **Sherman Act Section 1: Conspiracy in Restraint of Trade**. The coordinated use of VoIP-Pal's technology without authorization, coupled with zero-cost bundling practices, constitutes a conspiracy to restrain trade, restricting competition and damaging VoIP-Pal's market position.

116.  **Sherman Act Section 2: Monopolization**. The monopolization of Wi-Fi calling through unauthorized use of VoIP-Pal's technology reflects predatory behavior aimed at maintaining market dominance and excluding competitors.

117.  **Clayton Act Section 3: Exclusive Dealing Arrangements**. The Defendants' bundling of Wi-Fi calling with cellular services creates exclusive dealing arrangements that prevent VoIP-Pal from offering its technology independently, restricting market access and competition.

### J. Relevant Precedent Court Cases

118.  **United States v. Microsoft Corp.** (2001). **Case Summary**: Microsoft was found guilty of monopolistic practices, including illegal technology use and bundling strategies that harmed competitors. **Relevance**: Illustrates how illegal deployment and monopolistic control of technology can impact competition and innovation, similar to the Defendants' use of VoIP-Pal's technology.

119.  **Broadcom Corp. v. Qualcomm Inc.** (2007). **Case Summary**: Addressed anticompetitive practices related to technology patents and monopolistic control, focusing on exclusionary tactics by Qualcomm. **Relevance**: Highlights the impact of unauthorized technology use and market control on competitors, akin to the effects on VoIP-Pal.

120.  **Eastman Kodak Co. v. Image Technical Services, Inc.** (1992). **Case Summary**: Addressed Kodak's monopolistic practices and their impact on competitors, emphasizing the need for antitrust remedies in cases of technology misuse. **Relevance**: Relevant to understanding the broader impacts of technology control and market distortion, similar to issues faced by VoIP-Pal.

## REQUEST FOR COURT CONSIDERATION: THE INTERPLAY OF ANTITRUST LAW AND PATENT LITIGATION

121.  VoIP-Pal's case presents a critical opportunity for the Court to address the complex relationship between antitrust law and patent litigation. In light of this Antitrust complaint, we respectfully request that the Court consider the following three pivotal issues:

### A.  Antitrust Breaches Must Take Priority Over Patent Litigation

122.  Antitrust law is designed to protect consumers and ensure fair competition, while patent litigation primarily concerns the rights of patent owners. Given the broader societal impact of antitrust breaches, it is crucial that antitrust claims take precedence. As long as the illegally deployed technology can confirm a priority date through the issued patent, the Defendants' anticompetitive conduct using the technology remains actionable under antitrust law.

123.  *Precedent Case:* In **Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.** (1965), the Supreme Court established that antitrust claims can be pursued independently of patent validity, particularly when the antitrust violation involves fraudulently obtained patents.

This case underscores the importance of separating antitrust breaches from patent disputes to ensure monopolistic practices do not go unchecked.

### B. Antitrust Liability Persists Even with Invalidated Patent Claims

124. The invalidation of specific patent claims does not absolve Defendants of liability for antitrust breaches. If the Defendants used VoIP-Pal's technology, even those parts later found to be invalid, to engage in anticompetitive practices, they remain liable under antitrust law. The Court must consider how the Defendants utilized the technology, not just the validity of individual claims.

125. *Precedent Case:* The **Nobelpharma AB v. Implant Innovations, Inc.** (1998) decision by the U.S. Court of Appeals for the Federal Circuit affirmed that a company could pursue antitrust claims if a patent was enforced in bad faith, even if the patent was eventually deemed invalid. This case demonstrates that antitrust liability hinges on the conduct surrounding the use of the patent, not merely on the patent's validity.

### C. Antitrust Liability Extends Beyond the 20-Year Patent Term

126. Antitrust liability is not confined to the 20-year lifespan of a patent. As long as the technology continues to be used in a way that breaches antitrust laws, liability persists, even after the patent expires. This is crucial for ensuring effective antitrust enforcement over time, preventing long-term harm to competition and consumers.

127. *Precedent Case:* In **In re Ciprofloxacin Hydrochloride Antitrust Litigation** (2008), the U.S. Court of Appeals for the Federal Circuit recognized that antitrust claims could proceed even after the patent in question was found valid or invalid, as long as there was evidence that the patent was used to violate antitrust laws. This precedent supports the notion that antitrust liability can extend beyond the patent's expiration date.

### D.  The Primacy of Antitrust Litigation Over Patent Litigation: A Detailed Analysis

128.  Antitrust litigation must take precedence over patent litigation, especially in cases where monopolistic practices are at play. This prioritization is essential to protect the broader public interest, ensure fair competition, and prevent the abuse of patent rights. Below, we detail the reasons why antitrust litigation should take priority over patent disputes, supported by historical precedents and legal principles.

#### 1.  Protection of Consumer Welfare and Market Competition

129.  Antitrust laws are fundamentally designed to protect consumer welfare and ensure competitive markets. When monopolistic practices are alleged, the potential harm extends far beyond individual patent disputes. Antitrust violations can lead to inflated prices, reduced innovation, and limited consumer choices, affecting millions of consumers and entire industries.

130.  **Example from VoIP-Pal Antitrust Case**: In the context of VoIP-Pal's Antitrust complaint, the Defendants' bundling of Wi-Fi calling services with cellular calling and texting restricts market competition and consumer choice. Addressing these antitrust violations has a more immediate and far-reaching impact on market dynamics and consumer welfare than resolving patent disputes.

#### 2.  Addressing Systemic Issues vs. Individual Disputes

131.  Antitrust litigation addresses systemic issues within an industry, such as monopolistic behavior, predatory pricing, and exclusionary practices. In contrast, patent litigation typically concerns the rights and obligations between individual parties over specific technologies.

132.  **Systemic Impact**: The outcome of antitrust cases can reshape entire markets, creating a more level playing field for all participants, including small businesses and innovators. Patent litigation, while important, usually impacts only the parties involved and the specific technology in

question.

### 3.   Preventing the Abuse of Patent Rights

133.   Patent rights are intended to incentivize innovation by granting temporary monopolies on new inventions. However, when these rights are used to engage in anticompetitive practices, they can harm the very innovation they were meant to protect.

134.   **Antitrust Concerns in Patent Use**: The use of patents to enforce exclusionary practices, as seen in some cases, can lead to antitrust violations. For example, bundling patents with other products or services to stifle competition can be a misuse of patent rights, requiring antitrust intervention.

135.   **Court Precedent**: The U.S. Supreme Court, in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172 (1965), established that the enforcement of a patent obtained by fraud can violate antitrust laws. This precedent highlights the intersection of patent and antitrust law, emphasizing that patent rights do not provide immunity from antitrust scrutiny.

### 4.   Balancing Innovation with Competition

136.   While patents are crucial for fostering innovation, antitrust laws ensure that such innovation does not come at the expense of competition. Antitrust litigation is essential when patent holders attempt to use their patents to engage in anticompetitive behavior, such as tying, bundling, or refusing to license patents on fair terms.

137.   **Promoting Innovation**: Antitrust litigation prevents dominant firms from stifling competition by using patents as a tool to maintain or extend market power. This balance is critical to ensuring that innovation thrives in a competitive environment.

### 5.   Ensuring Compliance with Broader Economic Policies

138.   Antitrust laws align with broader economic policies aimed at maintaining competitive markets, promoting innovation, and protecting consumers. In contrast, patent litigation often focuses on

narrower technical or contractual issues.

139. **VoIP-Pal Case Relevance**: In VoIP-Pal's antitrust litigation, the focus is on how telecommunications giants are allegedly using their market power to stifle competition, which has broader economic implications than a patent dispute over a specific technology.

### 6.   Judicial Efficiency and Prioritization of Broader Impact

140. Given limited judicial resources, courts may prioritize cases with broader implications for public welfare and market health. Antitrust cases often involve extensive economic analysis and have the potential to influence entire industries, making them candidates for prioritization over individual patent disputes.

141. Court Precedents:

142. *United States v. Glaxo Group Ltd.,* 410 U.S. 52 (1973): The Supreme Court emphasized that patent rights are subject to antitrust laws and that antitrust concerns must be addressed to ensure patents are not used to perpetuate monopolies.

143. *FTC v. Actavis, Inc.,* 570 U.S. 136 (2013): The Court ruled that reverse payment settlements (where patent holders pay competitors to delay market entry) could violate antitrust laws, indicating that antitrust considerations can override patent settlements.

### 7.   Global Precedent and Regulatory Consistency

144. Antitrust litigation often sets important precedents that influence global markets and regulatory approaches. Given the international nature of many industries, ensuring consistency in antitrust enforcement is critical.

145. **Impact on International Markets**: In the VoIP-Pal case, resolving antitrust issues can set a global precedent, influencing how other countries approach similar cases and ensuring that large corporations adhere to fair competition principles worldwide.

146.    Antitrust litigation must take priority over patent litigation when broader market dynamics, consumer welfare, and competition are at stake.

### E.  Conclusion

147.    VoIP-Pal respectfully requests that the Court carefully consider these issues, which are central to the fair adjudication of this case. The principles and precedents outlined confirm that antitrust law must be prioritized, that invalidated patent claims do not negate antitrust liability, and that antitrust breaches extend beyond the life of a patent. Addressing these issues allows the Court to set a precedent that upholds the integrity of both antitrust law and the patent system, ensuring that justice is served for innovators and the general public.

148.    VoIP-Pal believes that recognizing these principles is essential to preventing the misuse of patents to shield anticompetitive behavior, protecting consumers, and fostering a competitive marketplace. We trust that the Court will consider these factors in its deliberations and deliver a ruling that promotes fairness, innovation, and justice.

## THE PARTIES

### A.  The Plaintiff

149.    VoIP-Pal.Com Inc., is a Nevada corporation with its principal place of business located at 7215 Bosque Boulevard, Waco, Texas 76710. VoIP-Pal is registered to do business in the State of Texas.

### B.  The AT&T Defendants

150.    On information and belief, Defendant AT&T, Inc. is a Delaware corporation with a principal place of business at 175 E Houston Street, San Antonio, Texas 78205. AT&T, Inc. may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas,

Texas 75201-3136. On information and belief, AT&T, Inc. is registered to do business in the District of Columbia.

151. On information and belief, Defendant AT&T Corporation is a New York corporation with a principal place of business at One AT&T Way Bedminster, New Jersey 07921. AT&T Corporation may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, AT&T Corporation is registered to do business in the District of Columbia. On information and belief, AT&T Corporation is a wholly owned subsidiary of AT&T, Inc.

152. On information and belief, Defendant AT&T Services, Inc. is a Delaware corporation with a principal place of business at 175 E Houston Street, San Antonio, Texas 78205. AT&T Services, Inc. may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, AT&T Services, Inc. is registered to do business in the District of Columbia. On information and belief, AT&T Services, Inc. is a wholly owned subsidiary of AT&T, Inc.

153. On information and belief, Scott T. Ford, Glenn H. Hutchins, William E. Kennard, Stephen J. Luczo, Marissa A. Mayer, David R. Mcatee II, Michael B. McCallister, Beth E. Mooney, Matthew K. Rose, John Stankey, Cynthia B. Taylor, and Luis A. Ubiñas are each a member of the Board of Directors of AT&T and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of AT&T regularly conducts business or is often present at the principal place of business of AT&T at 175 E Houston Street, San Antonio, Texas 78205 and may be served with process at that location or through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136.

154. On information and belief, the above AT&T Defendants regularly conduct and transact business

in the District of Columbia, throughout the United States, and within this District, and as set forth herein, have committed and continue to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.

### C.  The T-Mobile Defendants

155.    On information and belief, T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 Southeast 38th Street, Bellevue, Washington 98006. T-Mobile USA, Inc. may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. On information and belief, T-Mobile USA, Inc. is registered to do business in the District of Columbia.

156.    On information and belief, T-Mobile USA, Inc. is a subsidiary of German telecommunications company Deutsche Telekom AG headquartered in Bonn Germany Delaware corporation with its principal place of business at Friedrich-Ebert-Allee 140, Bonn, Germany 53113. Deutsche Telekom AG may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. On information and belief, Deutsche Telekom AG through its subsidiary T-Mobile USA, Inc. has regular and established places of business throughout this District.

157.    On information and belief, Timotheus Höttges, André Almeida, Marcelo Claure, Srikant M. Datar, Srinivasan Gopalan, Dr. Christian P. Illek, James J. Kavanaugh, Raphael Kübler, Thorsten Langheim, Dominique Leroy, Letitia A. Long, Mike Sievert, Teresa A. Taylor, and Kelvin R. Westbrook are each a member of the Board of Directors of T-Mobile and acting in an individual

corporate capacity and as part of a collective with other members of the Board of Directors of T-Mobile regularly conducts business or is often present at the principal place of business of T-Mobile at 12920 Southeast 38th Street, Bellevue, Washington 98006 and may be served with process at that location or through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

158.  On information and belief, Timotheus Höttges, Dr. Ferri Abolhassan, Birgit Bohle, Srini Gopalan, Christian P. Illek, Thorsten Langheim, Dominique Leroy, and Claudia Nemat, each are a member of the Board of Directors of Deutsche Telekom AG and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of Deutsche Telekom AG regularly conducts business or is often present at the principal place of business of T-Mobile at 12920 Southeast 38th Street, Bellevue, Washington 98006 and may be served with process at that location or through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

159.  On information and belief, the above T-Mobile Defendants regularly conducts and transacts business in the District of Columbia, throughout the United States, and within this District, and as set forth herein, has committed and continues to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.

### D.  The Verizon Defendants

160.  On information and belief, Verizon Communications, Inc. is a Delaware corporation with a principal place of business at 140 West Street, New York, New York 10013. Verizon

Communications, Inc. may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, Verizon Communications, Inc. is registered to do business in the District of Columbia.

161. On information and belief, Cellco Partnership dba Verizon Wireless is a Delaware general partnership with a principal place of business at One Verizon Way Basking Ridge, New Jersey 07920. Cellco Partnership dba Verizon Wireless may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801. On information and belief, Cellco Partnership dba Verizon Wireless is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Cellco Partnership dba Verizon Wireless is registered to do business in the District of Columbia.

162. On information and belief, Verizon Services Corp. is a Delaware corporation with a principal place of business at 1717 Arch Street, 21st Floor Philadelphia, Pennsylvania 19103. Verizon Services, Corp. may be served with process through its registered agent, the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, Verizon Services Corp. is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Verizon Services Corp. is registered to do business in the District of Columbia.

163. On information and belief, Verizon Business Network Services Inc. is a Delaware corporation with a principal place of business at 22001 Loudin County Parkway Ashburn, Virginia 20147. Verizon Business Network Services, Inc. may be served with process through its registered agent, the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On

information and belief, Verizon Business Network Services, Inc. is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Verizon Business Network Services, Inc. is registered to do business in the District of Columbia.

164. On information and belief, Vittorio Colao, Shellye L. Archambeau, Mark T. Bertolin, Roxanne S. Austin, Melanie L. Healey, Laxman Narasimhan, Clarence Otis, Jr., Daniel H. Schulman, Rodney E. Slater, Carol B. Tomé, Vandana Venkatesh, Hans Vestberg,  and Gregory G. Weaver are each a member of the Board of Directors of Verizon and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of Verizon regularly conducts business or is often present at the principal place of business of Verizon at 140 West Street, New York, New York 10013 and at 600 Hidden Ridge, Irving, TX 75038 and may be served with process at that location or through its registered agent, Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136.

165. On information and belief, the above Verizon Defendants regularly conduct and transact business in the District of Columbia, throughout the United States, and within this District, and as set forth herein, have committed and continue to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.

## VENUE SUITABILITY AND REQUEST FOR CONSOLIDATION

### A.  Venue Suitability

#### 1.  Business Operations

166.  The Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom—conduct extensive operations across the United States, including within the District of Columbia.

167.  The Defendants maintain significant business activities in the District of Columbia, including: a) Retail stores, b) Service centers, and c) Network infrastructure.

#### 2.  Market Reach

168.  A substantial portion of the Defendants' approximately 373 million subscribers likely reside within the District of Columbia, making this venue directly relevant to the issues at hand.

#### 3.  Retail Presence in the District of Columbia.

169.  **AT&T**: With approximately 5,340 retail stores across the United States, there are approximately 5-10 AT&T retail stores in Washington, D.C. **Corporate Satellite Offices**: AT&T maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

170.  **Verizon**: With approximately 6,259 retail stores across the United States, there are approximately 8-12 retail stores in Washington, D.C. **Corporate Satellite Offices**: Verizon maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

171. **T-Mobile**: With approximately 6,272 retail stores across the United States, there are approximately 6-10 retail stores in Washington, D.C. **Corporate Satellite Offices**: T-Mobile maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

### 4.  Jurisdiction and Venue Considerations

172. Federal district courts have jurisdiction over antitrust cases and class actions, making the District Court for the District of Columbia an appropriate venue due to:

    *a)*  Significant connections to the alleged violations and their impacts.

    *b)*  The presence of the Defendants' business operations.

    *c)*  A substantial number of affected consumers in the region.

### 5.  Jury Trial Considerations

173. The District Court for the District of Columbia provides a diverse jury pool, with local jurors potentially having a vested interest in the outcome, leading to a more engaged and representative jury.

### B.  Request For Consolidation

### 1.  Judicial Efficiency

174. The District Court for the District of Columbia has a vested interest in consolidating related antitrust actions, whether class actions or other civil matters, before the same court or judge. This court is a suitable venue for both the VoIP-Pal Antitrust complaint and the concurrently filed Antitrust Class Action.

### 2. Benefits of Consolidation

175.   Consolidating these cases will provide numerous judicial benefits, including:

   *a)* The reduction of duplicate proceedings.

   *b)* Streamlined evidence presentations.

   *c)* Efficient witness testimonies.

   *d)* Consistent rulings on similar legal issues and facts.

### 3. Streamlined Discovery Process

176.   Both cases involve shared evidence related to the Defendants' practices, which will benefit from a more efficient discovery process, including the scheduling and testimony of expert witnesses.

### 4. Rationale for Consolidation

177.   The rationale for consolidating the VoIP-Pal Antitrust complaint and the Antitrust Class Action is robust and well-founded.

178.   **Common Defendants**: Both complaints target the same set of Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom. This overlap indicates a shared pattern of alleged anticompetitive behavior, ensuring that the same entities are held accountable for similar violations.

179.   **Similar Violations of Law**: Both complaints allege violations of the Sherman Act and the Clayton Act, specifically targeting anticompetitive practices that restrain trade and commerce, as well as mergers and practices that substantially lessen competition. The similarities in the alleged violations underscore a common legal framework and set of facts applicable to both cases.

180.   **Shared Factual Background**: Both complaints address similar anticompetitive practices, including:

*a)* **Service Bundling and Tying**: The complaints challenge the Defendants' practice of bundling Wi-Fi calling and mobile data with cellular services, creating barriers to entry and inflating consumer costs.

*b)* **Patent Misuse and Intellectual Property Violations**: The VoIP-Pal Antitrust complaint specifically highlights the unauthorized use of VoIP-Pal's patented technology by the Defendants, which intersects with broader allegations of anticompetitive behavior in the Antitrust Class Action.

### 5. Strategic Implications

181. Consolidating these cases will allow for a comprehensive examination of the Defendants' practices and their impact on competition and consumer choice. Given the overlap in the business practices of the Defendants and the similar nature of the legal claims, a unified approach will facilitate a more thorough and coherent judicial review.

### 6. Efficiency and Consistency

182. Consolidating the cases offers several advantages:

*a)* **Reduced Burden on All Parties**: A single consolidated case reduces the burden on the Plaintiffs, Defendants, and the Court by streamlining proceedings and avoiding duplication of efforts.

*b)* **More Efficient Use of Court Resources**: Combining the cases ensures that judicial resources are used more effectively, avoiding the need for multiple sets of proceedings and hearings.

*c)* **Consistent Application of Law**: A consolidated case promotes the consistent application of legal principles, ensuring that similar facts and claims are adjudicated uniformly, thereby reducing the risk of conflicting judgments.

### 7. Appropriate Venue

183.   The District Court for the District of Columbia is an appropriate venue for both the VoIP-Pal Antitrust complaint and the Antitrust Class Action. This Court's jurisdiction and expertise in handling complex antitrust matters make it well-positioned to manage a consolidated case involving multiple Defendants and overlapping legal issues.

184.   Consolidating the VoIP-Pal Antitrust complaint and the Antitrust Class Action is warranted to enhance judicial efficiency, ensure consistent legal outcomes, and address the shared factual and legal issues in a unified manner. This approach will benefit all parties involved and support a fair and comprehensive resolution of the antitrust claims.

## STATEMENT OF THE CASE

185.   This antitrust action is brought by VoIP-Pal as the sole Plaintiff against Defendants AT&T Inc., T-Mobile US, Inc., Deutsche Telekom AG, and Verizon Communications Inc. The Defendants control 97% of the U.S. mobile telecommunications market. The Defendants are alleged to have violated the Sherman Act (Sections 1 and 2) and the Clayton Act (Sections 2, 3, 7, 4, and 16). The Defendants have committed and continue to commit acts within this District that harm the Plaintiff and violate the Sherman and Clayton Acts, including but not limited to:

- **Tying Arrangements and Forced Bundling**:
    - Violation: Sherman Act §1 and Clayton Act §3.
    - Effect: Suppresses competition and restricts consumer choice.

- **Monopolization of Wi-Fi Calling Markets**:

  o  Violation: Sherman Act §2 and Clayton Act §7.

  o  Methods: Predatory pricing, exclusive dealing, creation of barriers to entry.

  o  Effect: Suppresses competition and restricts consumer choice.

- **Price-Fixing**:

  o  Violation: Sherman Act §1.

  o  Evidence: Uniform pricing strategies across carriers.

  o  Effect: Suppresses competition and restricts consumer choice.

- **Discriminatory Pricing**:

  o  Violation: Clayton Act §2.

  o  Effect: Suppresses competition and increases pricing.

- **Group Boycott and Concerted Refusal to Deal**:

  o  Violation: Sherman Act §1

  o  Evidence: Collective refusal to offer standalone Wi-Fi calling services.

  o  Effect: Suppresses competition and restricts consumer choice.

- **Abuse of Patent Litigation**:

  o  Violation: Sherman Act §2.

  o  Effect: Exhausting competitor resources to maintain monopoly.

- **Fraudulent Misrepresentation**:

  o  Violation: Sherman Act §§1 and 2.

  o  Evidence: Deceptive marketing of "free" Wi-Fi calling while concealing true costs.

  o  Effect: Facilitates antitrust scheme.

- **Exclusive Agreements**:

  o  Violation: Clayton Act §3.

  o  Partners: MVNOs and suppliers.

  o  Effect: Substantially lessens competition.

186. These antitrust violations have suppressed competition, manipulated market conditions, and unlawfully deployed VoIP-Pal's patented technologies, causing substantial financial and consumer harm. The Court's intervention is necessary to address these violations, restore competitive balance, and protect the interests of the Plaintiff. The Defendants—AT&T Inc., T-Mobile US, Inc., Deutsche Telekom AG, and Verizon Communications Inc.—are alleged to have violated the Sherman Act (Sections 1 and 2) and the Clayton Act (Sections 2, 3, 7, 4, and 16).

187. The Defendants collectively control over 97% of the U.S. mobile telecommunications market and have engaged in anticompetitive practices including tying, forced sales, price fixing, and predatory pricing strategies. These practices bundle Wi-Fi calling services with their cellular calling and texting services, creating illegal barriers to entry, restraining trade, monopolizing the market, and involving tacit collusion. This conduct has prevented fair competition in the Wi-Fi calling and texting market.

188. The Defendants' barrier to entry, restraint of trade, monopolistic conduct, and tacit collusion have harmed Plaintiff VoIP-Pal and its shareholders by preventing it from competing in the Wi-Fi calling market, resulting in lost sales, revenue, and market share. The Defendants have, through tying arrangements and forced sales, made Wi-Fi calling and texting a feature or "add-on" to the sale of their market-dominating product of cellular calling and texting, thus preventing VoIP-Pal from offering Wi-Fi calling and texting as a separate and individual service. The Defendants have forced the sale of their Wi-Fi calling and texting services upon subscribers in the market by bundling Wi-Fi calling and texting with cellular calling and texting. This has prevented consumers from purchasing Wi-Fi calling and texting as a standalone service from VoIP-Pal. These acts, alone or in addition to price fixing, price discrimination, and predatory pricing, monopolize the market for Wi-Fi calling and texting by allowing only the Defendants (and not

Plaintiff) to sell Wi-Fi calling and texting bundled with their market-dominating product of cellular calling and texting.

### A. Harm Caused to VoIP-Pal

189. **Economic Loss**: VoIP-Pal has experienced significant economic harm due to the exclusion of potential competitors from the market, leading to decreased market value and potential revenue losses.

190. **Stifled Innovation**: By blocking access to the market for potential competitors, the Defendants have stifled innovation, directly affecting VoIP-Pal's potential future earnings.

191. **Hindered Innovation**: The exclusion of competitors diminishes market innovation, depriving consumers of potentially superior and cost-effective alternatives.

192. **Market Distortion**: The Defendants' practices have significantly distorted the telecommunications market, reduced competition, denied the Plaintiff the opportunity to compete for business among the approximately 373 million subscribers.

193. **Widespread Impact**: The Defendants' anticompetitive behaviors have restricted consumer options and preserved monopolistic control, affecting the general public.

194. **Economic Loss**: VoIP-Pal has experienced significant economic harm due to its exclusion as potential competitors from the market, leading to decreased market value, restricted options, and potential revenue losses.

195. **Stifled Innovation**: By blocking access to the market for VoIP-Pal's technology and know-how, the Defendants have stifled innovation, directly affecting licensing, investments, and future earnings.

### B. Specific Allegations

196. **Illegal Deployment of Wi-Fi Calling Routing Classifications**: The Defendants have unlawfully

used Wi-Fi calling routing classifications to their advantage, excluding fair competition.

197.  **Control Over MVNOs**: The Defendants' control over Mobile Virtual Network Operators (MVNOs) prevents standalone Wi-Fi calling services from being offered, maintaining their market stranglehold.

198.  **Zero-Cost Model for Wi-Fi Calling**: The Defendants' zero-cost model forces potential competitors to offer heavily discounted services, leading to significant financial harm and market distortion.

### C.  Factual Allegations

199.  **Market Dominance**: The Defendants control over 97% of the U.S. mobile telecommunications market and therefore hold dominant positions in the market.

200.  **Exclusionary Practices**: The Defendants, controlling over 97% of the U.S. mobile telecommunications market, leverage their dominant positions to engage in a variety of exclusionary practices:

> *a)*  **Tying and Bundling**: The Defendants have tied and bundled Wi-Fi calling services with their cellular calling and texting services, forcing consumers to purchase unnecessary services and stifling competition.

> *b)*  **Forced Sales and Price Fixing**: The Defendants have engaged in forced sales and price-fixing strategies, manipulating the market to maintain their dominance and control over pricing structures.

> *c)*  **Predatory Pricing**: The Defendants have used predatory pricing tactics to undercut competitors, driving them out of the market and then raising prices once competition is eliminated.

### D. Antitrust Violations

#### 1. Illegal Bundling and Tying Arrangements

201.   **Sherman Act Section 1; Clayton Act Section 3**: The Defendants' practices force consumers to buy unwanted services, limiting competition and consumer choice.

#### 2. Exclusive Dealing

202.   **Clayton Act Section 3**: The Defendants' exclusive dealing arrangements prevent smaller competitors from accessing necessary resources and networks, substantially lessening competition.

#### 3. Price Discrimination

203.   **Clayton Act Section 2**: The Defendants' zero-cost model for Wi-Fi calling constitutes price discrimination that distorts the market and harms competition.

#### 4. Predatory Pricing

204.   **Sherman Act Section 2; Clayton Act Section 3**: The Defendants engage in predatory pricing to eliminate competition, only to raise prices once competitors are driven out.

### E. Weighing the Evidence

205.   The Evidence supports Plaintiff's claims: a) Market dominance, b) Uniform practices, c) Lack of standalone options, d) Price uniformity, e) Technological feasibility, f) Financial impact, g) Barriers to entry, h) Consumer harm, and i) Expert testimony. This evidence demonstrates systematic antitrust violations, market exploitation, and significant harm to consumers, shareholders, and innovative companies like VoIP-Pal.

### F. Legal Precedents

206.   Legal precedents supporting these claims include:

**a)** *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992)*:* Tying arrangements violating antitrust laws.

**b)** *United States v. Microsoft Corp*., 253 F.3d 34 (D.C. *2001):* Tying products to preserve market dominance is illegal.

**c)** *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985)*:* Conduct harming competition violates antitrust laws.

**d)** Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993): Illegality of predatory pricing.

**e)** *FTC v. McWane, Inc.,* 783 F.3d 814 (11th Cir. 2015)*:* Impact of exclusive dealing arrangements on competition.

**f)** *Basic Inc. v. Levinson,* 485 U.S. 224 (1988)*:* Consequences of fraudulent misrepresentation and deceit in market practices.

**g)** *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968): Supports the plaintiff's claim for damages, even if some of the overcharge was passed on to customers h) Lorain Journal Co. *v.* United States, 342 U.S. 143 (1951). Illustrates how a dominant firm's refusal to deal can violate antitrust laws.

**h)** **United States v. Aluminum Co.** *of America,* 148 F.2d 416 (2d Cir. 1945). Demonstrates how monopoly power, even if not deliberately acquired, can violate antitrust laws when maintained.

**i)** *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973). Shows how a company's refusal to deal with potential competitors can constitute monopolization.

### G. FTC and DOJ Positions

207. The Federal Trade Commission (FTC) and the Department of Justice (DOJ) have consistently emphasized that anticompetitive practices, such as those engaged in by the Defendants, violate federal antitrust laws. Recent FTC comments underscore the importance of maintaining competitive markets free from illegal bundling and predatory pricing strategies that harm consumers and stifle innovation. The DOJ has similarly highlighted the detrimental effects of monopolistic practices and has taken strong stances against exclusive dealing and tying arrangements that restrict competition and consumer choice.

### H. Request for Relief

208. Given the substantial harm to the Plaintiff this civil action complaint seeks to:

   *a)* **Restore Competitive Balance**: Implement measures to ensure fair competition in the telecommunications market.

   *b)* **Protect Consumer Interests**: Prevent the Defendants from engaging in further anticompetitive practices.

   *c)* **Ensure a Fair Market Environment**: Provide consumers with more choices and fair pricing for telecommunications services.

## <u>HIGH BAR OF TWOMBLY</u>

209. In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Supreme Court established a stringent standard for antitrust pleadings under the Sherman Act, requiring sufficient factual matter to suggest that an agreement was made. The allegations in this case meet and exceed the Twombly standard, with detailed claims that AT&T, Verizon, T-Mobile, and Deutsche Telekom—who

collectively control over 97% of the U.S. mobile market—engaged in collusion through uniform practices of bundling Wi-Fi calling with cellular services and offering Wi-Fi calls at zero cost. This conduct restricts market entry, harms competition, and demonstrates not only parallel behavior but also clear indicators of collusion.

### A. Factual Pleadings

#### 1. Parallel Conduct and Plus Factors

210. **Simultaneous Actions:** The Defendants uniformly bundle Wi-Fi calling with cellular services, offering Wi-Fi at no additional cost. This practice restricts competition and limits consumer choice, evidencing parallel conduct that signals coordinated behavior.

211. **Tying and Forced Sales**: The Defendants compel consumers to purchase bundled services by tying Wi-Fi calling to cellular services, thereby denying consumers the option of standalone Wi-Fi calling in clear violation of antitrust laws.

212. **Increased Costs for Consumers**: The refusal to offer standalone Wi-Fi calling inflates consumer costs, placing an undue financial burden on consumers.

213. **Predatory Pricing**: By offering Wi-Fi calling at zero cost despite the associated expenses, the Defendants engage in predatory pricing, which is designed to eliminate competition and solidify their market control.

#### 2. Motivations Against Self-Interest

214. **Market Concentration:** The Defendants' overwhelming control over the mobile market creates a conducive environment for collusion, reducing the level of competition significantly.

215. **Barriers to Entry**: The Defendants' dominance, coupled with their pricing strategies, erects substantial barriers for new competitors, ensuring their continued market dominance.

216. **Economic Evidence:** The Defendants' decision to price Wi-Fi calling at zero, despite it incurring

costs, demonstrates a calculated strategy to suppress competition rather than a legitimate business justification.

### 3. Tacit Collusion and Industry Structure

217. **Opportunities to Collude**: The Defendants likely engaged in behind-the-scenes coordination to maintain their anticompetitive practices, benefiting from their market dominance.

218. **Market Behavior**: The consistent bundling and pricing strategies employed by the Defendants suggest a coordinated effort to prevent the emergence of a standalone Wi-Fi calling market, further entrenching their monopolistic control.

219. **Deceptive Practices**: The Defendants mislead consumers by presenting their bundled pricing strategy as advantageous, while in reality, it stifles competition and limits consumer choice.

### B. Precedent Cases Supporting Plaintiffs' Factual Pleadings

220. *In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014): Successfully established allegations of price-fixing through parallel conduct and coordinated price increases, underscoring the importance of economic evidence and industry behavior in proving collusion.

221. *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583 (N.D. Cal. 2009): Allowed price-fixing and market allocation claims to advance based on uniform price increases, highlighting the relevance of consistent pricing strategies as evidence of antitrust violations.

222. *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 338 F. Supp. 3d 404 (E.D. Pa. 2019): Demonstrated that claims of price-fixing could meet the Twombly standard through well-documented parallel conduct combined with additional supporting factors.

223. *In re Automotive Parts Antitrust Litigation*, 27 F. Supp. 3d 612 (E.D. Mich. 2011): Established that price-fixing and bid-rigging allegations satisfied the Twombly standard through evidence of coordinated conduct, reinforcing the legal framework applicable to this case

### C. Meeting The High Bar of Twombly

224. The Plaintiffs' allegations extend beyond mere parallel conduct, satisfying the rigorous standard set by Twombly for plausibility. The uniform practices of bundling Wi-Fi calling with cellular services, despite the associated costs, demonstrate coordinated behavior indicative of collusion. The Defendants' collective control over 97% of the U.S. mobile market creates an environment ripe for collusion, and the Plaintiffs have provided detailed, economically supported accounts of this conduct. Post-Twombly cases, such as In re Urethane Antitrust Litigation and In re TFT-LCD Antitrust Litigation, validate the sufficiency of these pleadings, justifying the case's advancement to the discovery phase and a full consideration of its merits.

## STANDING FOR VOIP-PAL AS PER ARTICLE III AND THE FEDERAL ANTITRUST LAWS OF THE SHERMAN AND CLAYTON ACTS

### A. Standing Of VoIP-Pal Under Article III

225. To pursue legal action under Article III of the U.S. Constitution, Plaintiffs must demonstrate standing, which requires (1) injury in fact, (2) causation, and (3) redressability. This complaint brings forth claims on behalf of VoIP-Pal, which has been affected as a direct victim by the Defendants' anticompetitive practices.

226. VoIP-Pal Inc. alleges specific harms from the Defendants' bundling of Wi-Fi calling services with cellular calling and texting services, involving tying, forced sales, price fixing, and predatory pricing.

227. **Injury in Fact**: VoIP-Pal has suffered direct economic harm from the Defendants' anticompetitive practices, including monopolistic control, tying arrangements, and predatory pricing. These practices have prevented VoIP-Pal from competing effectively and have

diminished its market value and growth potential.

228. **Causation:** The harm to VoIP-Pal is a direct consequence of the Defendants' illegal monopolistic practices, including their refusal to allow standalone Wi-Fi calling services, which directly impacts VoIP-Pal's ability to offer competitive alternatives.

229. **Redressability**: The Court's intervention can provide redress through:

   *a)* **Injunctive Relief:** Ordering the Defendants to cease their anticompetitive practices.

   *b)* **Restitution and Damages:** Compensating for the financial losses and market damage suffered by VoIP-Pal.

   *c)* **Structural Remedies:** Imposing measures to restore competitive conditions and allow VoIP-Pal to compete on a level playing field.

   *d)* **Monitoring and Compliance:** Ensuring ongoing adherence to fair competition standards.

230. The economic and market injuries suffered by the Plaintiff is a direct consequence of the Defendants' illegal bundling practices, monopolistic market control, and other anticompetitive actions. These harms necessitate judicial intervention. By granting the requested relief, the Court will address the economic harm experienced by the Plaintiff, ensuring that the Defendants cease their unlawful practices, and provide appropriate restitution and compensation. Structural remedies and monitoring mechanisms will prevent future violations, thereby providing comprehensive and effective relief. This will restore competitive market conditions, protect consumer interests, and uphold the principles of fair trade and competition.

### B. Precedent Cases Supporting VoIP-Pal's Standing

231. In In re IBM Corp. Securities Litigation, 163 F.3d 102 (2d Cir. 1998), the Court upheld the

standing of a company to pursue claims for harm done to its market position and financial performance.

232. Other Support: Warth v. Seldin, 422 U.S. 490 (1975), Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000).

233. The injuries suffered by VoIP-Pal due to the Defendants' practices are clear, direct, and redressable, fulfilling the requirements for standing under Article III. The evidence presented unequivocally demonstrates that VoIP-Pal in this antitrust action meets the stringent requirements for standing under Article III of the U.S. Constitution. VoIP-Pal has suffered concrete and particularized injuries, directly traceable to the Defendants' anticompetitive practices, and redressable by the relief sought from this Court.

234. VoIP-Pal Inc. has sustained direct economic injuries and diminished market value as a result of the Defendants' practices. As the target of anticompetitive behavior, VoIP-Pal's standing is straightforward, with a clear line of causation from the Defendants' actions to the company's injuries.

235. This injury is a direct consequence of the Defendants' illegal bundling practices, which have stifled VoIP-Pal's market potential and competitiveness. The causal link between the Defendants' actions and VoIP-Pal is clear and unambiguous.

236. The redressability of these injuries through injunctive relief, damages, and structural remedies is well-established. The Court has at its disposal a range of tools to provide meaningful relief to the Plaintiff, from monetary compensation to market restructuring that can prevent future harm.

237. Moreover, the precedent cases cited, including Lujan v. Defenders of Wildlife, provide robust support for VoIP-Pal's standing. These cases affirm that the types of injuries suffered by the

Plaintiff is precisely those that Article III standing is designed to address in the context of complex litigation involving market-wide anticompetitive practices.

238.    Accordingly, the Plaintiff presents a compelling case for standing under Article III. Their injuries are concrete, particularized, and directly traceable to the Defendants' actions. The relief sought is within the Court's power to grant and would effectively redress the harms suffered. By recognizing VoIP-Pal's standing, the Court has the opportunity to address the full spectrum of anticompetitive effects stemming from the Defendants' conduct. This comprehensive approach is not only justified by the facts and law but is essential for upholding the integrity of the market and protecting the interests of shareholders, consumers, and innovative companies alike. The Court should therefore affirm the standing of the Plaintiff, paving the way for a thorough examination of the merits of this critical antitrust case.

### C.  Federal Standing of VoIP-Pal

#### 1.  Harm to VoIP-Pal Under the Federal Antitrust Laws of the Sherman and Clayton Acts

239.    VoIP-Pal has suffered significant economic harm as a direct result of the Defendants' violations of federal antitrust laws, specifically the Sherman Act and the Clayton Act.

240.    **Violation of the Sherman Act:** The Defendants have engaged in unlawful monopolistic practices, including maintaining and abusing their dominant market position, tacit collusion, erecting barriers to entry, and restraining trade. These practices violate Section 1 and Section 2 of the Sherman Act, which prohibit restraint of trade and monopolistic practices.

241.    **Violation of the Clayton Act:** The Defendants have engaged in prohibited practices, including tying arrangements, exclusive dealing, and mergers and acquisitions that substantially lessen competition and create monopolistic market conditions. These actions contravene Sections 2, 3,

and 7 of the Clayton Act, which address anticompetitive effects and restrict mergers that lessens competition.

242. **Economic Harm to the Plaintiff:** The unlawful conduct of the Defendants has led to significant financial losses and market damage to VoIP-Pal.

243. **Causation**: The harm to VoIP-Pal is a direct consequence of the Defendants' illegal monopolistic practices and anticompetitive conduct.

244. **Redressability**: The Court's intervention can provide redress through:

    *a)* **Injunctive Relief:** Ordering the Defendants to cease their anticompetitive practices.

    *b)* **Restitution and Damages:** Compensating for the financial losses and market damage suffered by VoIP-Pal.

    *c)* **Structural Remedies:** Imposing measures to restore competitive conditions and allow VoIP-Pal to compete on a level playing field.

    *d)* **Monitoring and Compliance:** Ensuring ongoing adherence to fair competition standards.

245. Based on the facts and relevant legal precedents, the Plaintiff respectfully requests that the Court find the Defendants in violation of federal antitrust laws under the Sherman Act and Clayton Act for their monopolistic practices. VoIP-Pal has demonstrated concrete injuries, clear causation, and redressability. The Defendants' actions violate both the Sherman and Clayton Acts, necessitating comprehensive relief to restore competition and compensate for injuries. Precedents such as *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519 (1983) and *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982) support VoIP-Pal's standing in this antitrust action.

### D.   Inclusion of Deutsche Telekom AG in Antitrust Complaints: A Necessary Component

246. The Plaintiffs' decision to include Deutsche Telekom AG as a Defendant alongside AT&T, Verizon, T-Mobile, and Deutsche Telekom US is both justified and essential for a comprehensive examination of the alleged anticompetitive practices in the U.S. telecommunications market. The rationale for this inclusion is as follows.

247. **Substantial Ownership Stake:** Deutsche Telekom AG holds a majority ownership stake in T-Mobile US. This controlling interest provides Deutsche Telekom with considerable influence over T-Mobile's strategic decisions and operational policies.

248. **Board Representation:** The Board of Deutsche Telekom AG (DT) consists of seven members, while T-Mobile US, Inc. (TM) has thirteen. Notably, four key members—Thorsten Langheim, Dominique Leroy, Srini Gopalan, and Christian P. Illek—serve on both boards, indicating significant influence from the parent company on T-Mobile's operations. Additionally, Timotheus Höttges, who is the Chief Executive Officer of Deutsche Telekom, also serves as the Chairman of T-Mobile's Board, further consolidating the strong management and strategic control exercised by the parent company over its subsidiary.

249. **Strategic Influence:** Through its substantial ownership and significant board representation, Deutsche Telekom plays a critical role in shaping T-Mobile's market behavior, directly impacting competition and consumer costs.

250. **Legal Basis for Inclusion:** Including Deutsche Telekom AG in the complaint is legally justified due to:

   *a)* **Market Impact:** Deutsche Telekom's significant ownership stake in T-Mobile influences the company's market practices and competitive strategies.

    *b)* **Corporate Governance:** Deutsche Telekom's board representation grants it direct authority over key corporate decisions, particularly in areas such as service bundling and pricing.

251. Furthermore, it is important to note that Deutsche Telekom AG's business model extends beyond its involvement with T-Mobile US. In Germany, Deutsche Telekom operates under a similar framework where Wi-Fi calling is tied to cellular services, and mobile data is bundled with cellular plans, without offering standalone options. This practice reflects a consistent strategy of tying and bundling services.

252. Deutsche Telekom AG's MVNOs across Europe also adhere to this restrictive model. These MVNOs do not offer Wi-Fi calling or mobile data as standalone services, maintaining the same bundling practices observed in Deutsche Telekom AG's core operations.

253. This consistent approach across multiple markets reinforces the necessity of including Deutsche Telekom AG in the antitrust complaints. It demonstrates a pattern of anticompetitive behavior that spans multiple markets and affects a broad spectrum of consumers.

## PIERCING THE CORPORATE VEIL AND DIRECTORS' LIABILITY

254. This action confronts the Defendants' systematic fraudulent misrepresentation, deceit, and anticompetitive practices concerning Wi-Fi calling and mobile data services. These actions constitute clear violations of key antitrust laws, specifically Sections 1 and 2 of the Sherman Act and Sections 2, 3, and 7 of the Clayton Act. Due to the deliberate and pervasive nature of these violations, it is imperative to pierce the corporate veil and hold the Directors personally accountable.

### A. Anticompetitive Conduct and Fraudulent Misrepresentation

255.  The Defendants, controlling over 97% of the U.S. mobile telecommunications market, have leveraged their market dominance to engage in anticompetitive practices, including the following.

256.  **Tying and Forced Sales:** The Defendants violated Sherman Act §1 and Clayton Act §3 by bundling Wi-Fi calling services with cellular services, coercing consumers into purchasing unwanted services.

257.  **Monopolization:** The Defendants breached Sherman Act §2 by strategically preventing competition and maintaining dominance over the Wi-Fi calling market.

258.  **Price Fixing and Predatory Pricing:** The Defendants engaged in price manipulation in violation of Sherman Act §1, offering Wi-Fi calling at no additional cost while charging for cellular services, thereby misleading subscribers into believing they were benefiting financially.

259.  **Unlawful Mergers and Acquisitions:** The Defendants breached Clayton Act §7 by consolidating market control through acquisitions, eliminating potential competitors, and erecting barriers to market entry.

### B. Justification for Piercing the Corporate Veil

260.  The Directors of the Defendant corporations were not only aware of but actively participated in these fraudulent and anticompetitive practices. Their direct involvement in these actions warrants piercing the corporate veil due to:

261.  **Unity of Interest and Ownership:** The Directors operated the corporations as mere extensions of their personal interests, aligning corporate actions with personal gain, and effectively using the corporations as alter egos.

262.  **Fraudulent Intent:** The Directors employed the corporate structure to perpetrate fraud, mislead consumers, and violate antitrust laws, specifically under Sherman Act §§1 and 2 and Clayton Act

§§2, 3, and 7.

263.   **Unjust Enrichment:** Allowing the corporate veil to remain intact would enable the Directors to unjustly retain personal profits derived from their fraudulent and anticompetitive activities, resulting in a gross miscarriage of justice.

### C.  Precedent Cases

264.   *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134 (1968): Established that the corporate veil could be pierced to hold individual directors and officers liable for antitrust violations, including tying arrangements and monopolistic practices under Sherman Act §§1 and 2 and Clayton Act §3.

265.   *United States v. Wise*, 370 U.S. 405 (1962): Demonstrated that corporate officers could be personally liable under Sherman Act §1 if they knowingly engaged in illegal antitrust activities.

266.   *Basic Inc. v. Levinson,* 485 U.S. 224 (1988): Highlighted that the omission of material facts, such as the true costs of Wi-Fi calling, can constitute fraud, supporting claims under Sherman Act §2.

267.   *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959 (Del. Ch. 1996): Established the duty of directors to implement monitoring systems to ensure compliance with legal obligations. The failure to do so, as evidenced in this case, represents a breach of fiduciary duties under Sherman Act §2 and Clayton Act §7.

### D.  Weighing the Evidence

268.   The Directors' active involvement in fraudulent, deceptive, and anticompetitive practices justifies piercing the corporate veil. Their conduct, which directly violates Sherman Act §§1 and 2 and Clayton Act §§2, 3, and 7, necessitates holding them personally liable. The Court should impose liability for all damages incurred by the Plaintiffs, including both compensatory and punitive damages, to ensure justice is served, market integrity is restored, and future corporate misconduct

is effectively deterred.


# COMPARATIVE ANALYSIS: UNITED STATES V. GOOGLE LLC AND UNITED STATES V. MICROSOFT CORP. AND THE VOIP-PAL ANTITRUST COMPLAINT

### A. Overview of Cases

#### 1. VoIP-Pal Antitrust Complaint:

269.    **Issue:** Monopolistic practices in telecommunications through tying arrangements and exclusionary conduct.

270.    **Defendants**: Major telecommunications carriers (AT&T, Verizon, T-Mobile).

271.    **Key Issue**: Tying Wi-Fi calling to cellular and texting services, preventing the offering of standalone Wi-Fi calling.

272.    **Violations:**

   *a)*   **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

   *b)*   **Clayton Act**: Section 3 (Exclusive Dealing), Section 7 (Mergers and Acquisitions).United States v. Google LLC:

273.    **Issue:** Monopoly maintenance through exclusionary contracts and tying practices in digital markets.

274.    **Defendant**: Google.

275.    **Key Issue**: Tying Google Search and Chrome to Android OS, exclusive contracts.

276.    **Violations**:

   *a)*   **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

#### 2. United States v. Microsoft Corp.:

277. **Issue:** Monopolistic practices through tying and exclusionary conduct in software markets.

278. **Defendant**: Microsoft.

279. **Key Issue**: Tying Internet Explorer to Windows OS.

280. **Violations**:

    *a)* **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

### B. Comparative Analysis

#### 3. Scope of Anticompetitive Conduct:

281. **VoIP-Pal Antitrust Complaint:** Encompasses a broad range of anticompetitive practices, including tying, exclusive dealing, and anticompetitive mergers.

282. **Google**: Focuses on exclusionary contracts and tying in digital markets.

283. **Microsoft**: Primarily centered on tying and exclusionary practices in software distribution.

#### 4. Market Power Abuse:

284. **VoIP-Pal Antitrust Complaint:** Exploits control over cellular infrastructure to dominate the emerging Wi-Fi calling market.

285. **Google**: Leverages its search engine dominance to control adjacent markets like mobile OS and digital advertising.

286. **Microsoft**: Utilized its OS monopoly to dominate the web browser market.

#### 5. Consumer Impact:

287. **VoIP-Pal Antitrust Complaint:** Directly impacts consumer choice in essential communication services, leading to inflated costs and limited options.

288. **Google**: Affects consumer access to digital services and information.

289. **Microsoft**: Restricted consumer choice in web browsers and software applications.

#### 6. Innovation Suppression:

**290.** **VoIP-Pal Antitrust Complaint:** Stifles the development of standalone Wi-Fi calling technologies, hindering innovation.

**291.** **Google**: Restricts innovation in search technologies and mobile applications.

**292.** **Microsoft**: Hampered browser innovation and the development of web standards.

### 7. Market Structure Effects:

**293.** **VoIP-Pal Antitrust Complaint:** Affects the structure of both cellular and internet-based communication markets, leading to increased consolidation.

**294.** **Google**: Influences the digital advertising, search, and mobile OS markets.

**295.** **Microsoft**: Impacted the PC operating system and web browser markets.

### 8. Legal Precedent Significance:

**296.** **VoIP-Pal Antitrust Complaint:** Has the potential to set new precedents in telecom antitrust law, particularly concerning emerging technologies.

**297.** **Google**: Establishes modern precedents for antitrust enforcement in digital markets.

**298.** **Microsoft**: Provided foundational precedents for antitrust actions in software and tech industries.

### 9. Regulatory Intersections:

**299.** **VoIP-Pal Antitrust Complaint:** Engages with FCC regulations and broader telecom laws.

**300.** **Google**: Involves considerations of digital privacy and data protection.

**301.** **Microsoft**: Focused on software and OS regulations.

### C. Weighing the Evidence

### 1. Comparative Legal Precedents and Market Dynamics:

**302.** **Relevant Case**: *United States v. AT&T Inc. (2011)* – This case addressed anticompetitive effects of market consolidation and monopolistic practices by AT&T, focusing on broader impacts on competition. The VoIP-Pal case illustrates similar monopolistic behaviors in the Wi-Fi calling

market.

### 2. Consumer Welfare and Market Structure:

303.    **Relevant Case:** *Leegin Creative Leather Products, Inc. v. PSKS, Inc. (2007)* – This case examined the effects of price maintenance agreements and their impact on competition. It highlights how bundling and price maintenance strategies can harm market competition, similar to the Defendants' practices in the VoIP-Pal case.

### 3. Breadth of Antitrust Violations:

304.    **Relevant Case:** *Standard Oil Co. v. United States (1911)* – The Supreme Court's decision to break up the Standard Oil monopoly addressed harmful market control and monopolistic practices. This historical case provides context for addressing similar monopolistic behavior and market control as seen in the VoIP-Pal case.

### D. Conclusion

305.    The VoIP-Pal Antitrust Complaint has the potential to be more consequential than the Google and Microsoft cases. Its broader scope of alleged violations and its focus on critical communication infrastructure position it as a pivotal case that could redefine the application of antitrust laws in the telecommunications industry. The outcome may influence the future of consumer communication services and determine how antitrust laws adapt to the rapid technological advancements reshaping global markets.

## THE COUNTS

306.    This case involves anticompetitive conduct and unauthorized use of technology by the Defendants, violating the Sherman and Clayton Acts. VoIP-Pal has suffered significant harm due to tying arrangements, monopolistic practices, and conspiracies that restrain trade in the Wi-Fi

calling market. The Defendants have engaged in forced bundling practices, specifically tying Wi-Fi calling to cellular calling and texting services. These practices have caused substantial economic harm to VoIP-Pal.

### A.  COUNT I: Monopolization and Attempts to Monopolize (Sherman Act §2)

307.   VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

308.   **Monopoly Power**: The Defendants possess monopoly power in the Wi-Fi calling market, stemming from their dominant market share and control over critical infrastructure.

309.   **Exclusionary Conduct**: The Defendants maintain and reinforce their monopoly power through exclusionary practices, including tying, forced sales, and predatory pricing. These actions are designed to eliminate competition and solidify their market dominance, constituting a clear violation of Sherman Act §2. **Precedent Case**: *United States v. Grinnell Corp.,* 384 U.S. 563 (1966). The Supreme Court established that monopolization requires both monopoly power in the relevant market and the willful acquisition or maintenance of that power. The Defendants' actions in this case align with this precedent by maintaining monopoly power through anticompetitive practices.

### B.  COUNT II: Tacit Collusion (Clayton Act §7)

310.   VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

311.   **Monopoly Power**: The Defendants' significant market share allows them to engage in tacit collusion, coordinating actions without explicit agreements, which leads to reduced competition and consumer harm.

312.   **Tacit Collusion**: The Defendants' coordinated pricing and service strategies, without explicit agreement, have effectively restrained trade, violating Clayton Act §7. **Precedent Case**: *American Tobacco Co. v. United States,* 328 U.S. 781 (1946). The Supreme Court found that tacit

collusion among major market players can violate antitrust laws. The Defendants' coordinated efforts to avoid competition in this case mirror the collusion identified in the American Tobacco case.

### C. COUNT III: Restraint of Trade (Sherman Act §1)

313. VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

314. **Monopoly Power**: The Defendants leverage their market control to engage in practices that unreasonably restrain trade.

315. **Contracts and Conspiracies**: The Defendants have entered into agreements that stifle competition and limit consumer choice, in direct violation of Sherman Act §1. **Precedent Case**: *Northern Pacific Railway Co. v. United States,* 356 U.S. 1 (1958). The Supreme Court held that agreements unreasonably restraining trade are per se violations of the Sherman Act. The Defendants' bundling practices in this case are consistent with the restraints on trade identified in Northern Pacific.

### D. COUNT IV: Tying (Clayton Act §3)

316. VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

317. **Monopoly Power**: The Defendants exploit their market dominance to force consumers into purchasing bundled services.

318. **Tying and Tied Products**: The Defendants have tied Wi-Fi calling to cellular services, restricting consumer choice and violating Clayton Act §3. **Precedent Case**: *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984). The Supreme Court ruled that tying arrangements, where the sale of one product is conditioned on the purchase of another, can violate antitrust laws. The Defendants' practices in this case fit within the illegal tying framework established by Jefferson Parish.

### E.  COUNT V: Forced Sale (Clayton Act §3)

319.  VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

320.  **Monopoly Power**: The Defendants coerce consumers into purchasing unwanted services through forced bundling.

321.  **Forced Sales**: Their bundling practices compel consumers to buy more than they need, violating Clayton Act §3. **Precedent Case**: *Standard Oil Co. of California v. United States*, 337 U.S. 293 (1949). The Supreme Court found that forcing consumers into purchasing additional products through monopolistic power constitutes a violation of the Clayton Act. The Defendants' forced bundling practices are analogous to those condemned in Standard Oil.

### F.  COUNT VI: Price Fixing (Clayton Act §2)

322.  VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

323.  **Monopoly Power**: The Defendants conspire to set prices for bundled services, thereby harming market competition.

324.  **Price Fixing**: The Defendants' coordinated pricing strategies lead to inflated prices, violating Clayton Act §2. **Precedent Case**: *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940). The Supreme Court ruled that price fixing is per se illegal under the Sherman Act. The Defendants' coordinated pricing strategies in this case align with the framework of illegal price fixing established by Socony-Vacuum.

### G.  COUNT VII: Predatory Pricing (Clayton Act §2)

325.  VoIP-Pal re-alleges and incorporates by reference herein all the allegations contained above.

326.  **Monopoly Power**: The Defendants engage in predatory pricing to eliminate competitors and consolidate their market dominance.

327.  **Below-Cost Pricing**: They offer services at no additional cost to drive out competition, violating

Clayton Act §2. **Precedent Case**: *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). The Supreme Court defined predatory pricing and its implications under the Sherman Act, establishing that predatory pricing practices are consistent with the predatory pricing identified in Brooke Group.

### H. Weighing the Evidence

328.  The Defendants' anticompetitive conduct, including compulsory bundling, predatory pricing, and price fixing, clearly violates multiple provisions of both the Sherman and Clayton Acts. The overwhelming evidence justifies not only treble damages but also strong injunctive relief to restore competition and prevent future violations. The Defendants' actions, supported by the directly applicable precedent cases, underscore the necessity of legal intervention to correct these injustices and protect consumer welfare.

### I. Comparative Analysis of Seven Counts: VoIP-Pal Antitrust Complaint, The Google Case, and The Microsoft Case

#### 1. Count I: Monopolization (Sherman Act §2)

329.  **Google Case**: Google maintained a monopoly through anticompetitive means, including exclusive agreements that foreclosed competition.

330.  **Microsoft Case**: Microsoft maintained its monopoly in the PC operating systems market through exclusionary practices.

331.  **VoIP-Pal Antitrust Complaint:** The monopolistic practices in all three cases demonstrate systemic abuse of market dominance. However, the VoIP-Pal case highlights broader coordination among major telecom players, indicating more extensive antitrust violations, specifically in the Wi-Fi calling market.

#### 2. Count II: Tacit Collusion (Clayton Act §7)

332. **Google Case**: The court focused on exclusionary practices rather than explicit tacit collusion.

333. **Microsoft Case**: While not explicitly addressing tacit collusion, the Microsoft case involved coordinated actions to suppress competition.

334. **VoIP-Pal Antitrust Complaint:** The recognition of exclusionary practices in both Google and Microsoft cases supports the claims of tacit collusion in the VoIP-Pal case. The Defendants' coordinated efforts to maintain market dominance echo the monopolistic behaviors seen in both tech giants' cases.

### 3. Count III: Restraint of Trade (Sherman Act §1)

335. **Google Case**: The court found Google's agreements stifled competition.

336. **Microsoft Case**: The tying of Internet Explorer to Windows OS was a key example of restraining trade.

337. **VoIP-Pal Antitrust Complaint:** Like Google and Microsoft, the VoIP-Pal case illustrates how the Defendants' contracts and conspiracies have significantly restrained trade, limiting consumer choices and inflating prices in the telecommunications market.

### 4. Count IV: Tying (Clayton Act §3)

338. **Google Case**: The court noted potential Clayton Act violations through exclusionary agreements.

339. **Microsoft Case**: Tying Internet Explorer to Windows OS was a central issue, leading to significant antitrust findings.

340. **VoIP-Pal Antitrust Complaint:** The tying practices in all three cases demonstrate significant anticompetitive effects. The VoIP-Pal case emphasizes how such practices have been extensively used by telecom giants to control emerging technologies like Wi-Fi calling.

### 5. Count V: Forced Sale (Clayton Act §3)

341. **Google Case**: The court noted the impact of Google's revenue-sharing agreements in entrenching

its monopoly.

342. **Microsoft Case**: While forced sale was not a primary focus, Microsoft's bundling practices echoed similar tactics.

343. **VoIP-Pal Antitrust Complaint:** The focus on forced sales through bundling in the VoIP-Pal case mirrors the tactics seen in Google's and Microsoft's cases, underscoring the coercive strategies used to maintain market control.

### 6.   Count VI: Price Fixing (Clayton Act §2)

344. **Google Case**: The court addressed Google's ability to raise prices due to its monopoly.

345. **Microsoft Case**: Price manipulation was a concern, though not the central issue.

346. **VoIP-Pal Antitrust Complaint:** Price-fixing concerns in the VoIP-Pal case resonate with issues in Google's case, highlighting the broader impacts of monopolistic control on pricing within the telecommunications sector.

### 7.   Count VII: Predatory Pricing (Clayton Act §2)

347. **Google Case**: The court did not explicitly address predatory pricing.

348. **Microsoft Case**: Predatory practices were scrutinized, particularly regarding market dominance.

349. **VoIP-Pal Antitrust Complaint:** The emphasis on predatory pricing in the VoIP-Pal case reflects aggressive strategies to eliminate competition, a tactic also scrutinized in Microsoft's case, highlighting the broader implications for market competition.

### 7.   Conclusion

350. The comparative analysis between the VoIP-Pal Antitrust Complaint, United States v. Google LLC, and United States v. Microsoft Corp. reveals a comprehensive approach to addressing monopolistic practices across different industries. The VoIP-Pal case, with its extensive scope, highlights a more complex set of antitrust violations that span multiple sections of both the

Sherman and Clayton Acts. Unlike the Google and Microsoft cases, which primarily focused on Sherman Act violations, the VoIP-Pal case addresses a wider array of anticompetitive practices, including exclusive dealing, tying, and price fixing. This suggests a more pervasive set of monopolistic practices within the telecommunications industry, particularly concerning the control of Wi-Fi calling services.

## DEMAND FOR JURY TRIAL

351. Under Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38(a), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff VoIP-Pal Inc. prays for judgment against the Defendants, jointly and severally, as follows:

### I. Conduct Remedies

1. **Injunctive Relief**: Issue an order enjoining Defendants from continuing their anticompetitive practices, including but not limited to illegal tying and bundling, exclusive dealing, price fixing, and predatory pricing strategies.

2. **Unbundling of Services**: Mandate the Defendants to immediately unbundle compulsory Wi-Fi calling and texting services from cellular calling and texting services, ensuring consumers can independently choose either or both of these services.

3. **Third-Party Interoperability**: Compel Defendants to facilitate third-party interoperability on native dialer and messaging applications for Wi-Fi calling and texting, fostering a competitive environment.

4. **Separate Service Purchase**: Ensure Defendants allow subscribers to purchase Wi-Fi calling and texting as separate services from other networks, including VoIP-Pal.

5. **Disclosure and Compensation**: Cease the offloading of cellular calls onto Wi-Fi networks without proper disclosure and compensation to subscribers, ensuring transparency and fairness.

## II. Monetary Damages

1. **Compensation for Financial Harm**: Award VoIP-Pal Inc. damages for the harm suffered due to the monopolistic bundling of Wi-Fi calling and texting with cellular calling and texting services, including direct financial losses and market impacts.

2. **Damages for Price Fixing**: Compensate VoIP-Pal Inc. for damages due to price fixing of Wi-Fi calling and texting, including inflated costs and reduced service quality.

3. **Lost Opportunity and Value**: Award damages for the loss of opportunity to market and sell Wi-Fi calling and texting services, and for the resulting loss of value.

4. **Enhanced Damages**: Grant enhanced or treble damages as provided under 15 U.S.C. § 15a, and supplemental damages for any continuing post-verdict anticompetitive conduct until the entry of final judgment.

5. **Reimbursement of Legal Costs**: Order Defendants to cover all legal costs incurred by VoIP-Pal Inc., ensuring full reimbursement for litigation expenses.

## III. Treble Damages

1. **Deterrence of Further Violations**: Award treble damages as stipulated in Section 4 of the Clayton Antitrust Act of 1914, codified at 15 U.S.C. § 15. This provision entitles

Plaintiff to recover three times the damages sustained, plus the cost of the suit, including reasonable attorney's fees.

## IV. Behavioral Remedies

1. **Facilitation of Competition**: Require Defendants to enable third-party interoperability on native dialers of smartphones for Wi-Fi calling and texting, promoting a competitive marketplace.

2. **Restoration of Competitive Conditions**: Implement injunctive relief to restore competitive conditions in the relevant markets affected by the Defendants' unlawful conduct.

3. **Structural Remedies**: Consider structural relief, which may include the divestiture of certain business units or assets, to promote fair competition.

## V. Restitution

1. **Monetary Restitution**: Award restitution to VoIP-Pal Inc. for harm, loss, and damage, including enhanced or treble damages as provided by 15 U.S.C. § 15a.

2. **Disgorgement of Profits**: Mandate restitution after an accounting and disgorgement of profits unfairly earned due to misrepresentations that Wi-Fi calling and texting are "free," resulting in unjust enrichment.

3. **Restitution for Unjust Enrichment**: Award restitution for harm, loss, and damage suffered by VoIP-Pal Inc. due to unjust enrichment from anticompetitive conduct and unauthorized use of technology.

## VI. Criminal and Civil Penalties

1. **Imposition of Penalties**: Order appropriate authorities to impose criminal and civil penalties on Defendants for antitrust and anticompetitive violations.

2. **Declaration of Violations**: Declare that Defendants, in their capacity as board members, officers, and employees, have committed criminal violations of the Clayton and Sherman Acts, 15 U.S.C. §§ 14 and 1.

## VII. Damages for Willful Antitrust Technology Misuse

1. **Compensation for Technology Misuse**: Compensate VoIP-Pal Inc. for harm, loss, and damage resulting from Defendants' breach of antitrust laws and misuse of VoIP-Pal's technology.

2. **Disgorgement of Profits**: Disgorge profits obtained from the misuse of VoIP-Pal's technology, acknowledging the priority date assigned by the U.S. Patent and Trademark Office or other methods.

## VIII. Extending the Damages Period

1. **Award Extended Damages**: Award damages for the entire period of Defendants' fraudulent misrepresentation, deceit, and misleading conduct related to Wi-Fi calling services, extending beyond the standard 4-year statute of limitations, due to:

- The continuing nature of the Defendants' violations;

- The active concealment of the true costs and nature of Wi-Fi calling services; and

- The delayed discovery of the fraudulent conduct by consumers and shareholders.

## IX. Prioritize Antitrust Claims

1. **Prioritize Antitrust Claims Over Patent Litigation**: Grant priority to the antitrust claims in this case over any ongoing patent litigation. The Court should recognize the broader and more pervasive impact of the Defendants' anticompetitive practices on market competition and consumer welfare. This prioritization is crucial to address issues that extend beyond the scope of patent infringement, directly affecting market integrity and innovation.

2. **Recognize the Enduring Nature of Antitrust Violations**: Acknowledge that, unlike patent protections, which are limited to a 20-year term, antitrust violations have enduring effects with no statutory time limit for seeking redress. The Court should ensure that the Defendants are held accountable for their actions, even if they extend beyond the life of the patents in question, and provide appropriate remedies that address the long-term consequences of their anticompetitive behavior.

3. **Respect USPTO Examiner Decisions Under the AIA Act**: Acknowledge and uphold the principle of res judicata as it applies to technical points previously examined and decided by USPTO patent examiners under the America Invents Act (AIA). The Court should refrain from re-litigating technical issues that have been thoroughly vetted by qualified USPTO examiners, including but not limited to: a) Obviousness determinations, b) Abstract idea considerations, b) Novelty assessments, c) Enablement and written

description requirements, d) Utility evaluations, e) Double patenting issues, and f) Prior art analysis and application. This approach respects the expertise of patent examiners in dealing with complex technical issues and upholds the integrity of the patent examination process. It also promotes efficiency in the legal system by avoiding duplicative efforts and potentially conflicting decisions on technical matters already addressed by the USPTO.

4. **Allow Antitrust Claims Despite Patent Invalidity Findings**: Permit the prosecution of antitrust claims related to the Defendants' use of VoIP-Pal's patented technology, even in cases where some claims of the patents have been found invalid by patent courts. The Court should recognize that antitrust violations can occur through the illegal deployment and profit from innovative technologies, regardless of the ultimate validity of specific patent claims. This approach ensures that anticompetitive behavior is addressable under antitrust laws, even when patent protections may be partially compromise.

5. **Recognize VoIP-Pal's Technology as Basis for Antitrust Claims**: Acknowledge that VoIP-Pal's technology and know-how, supported by its prior art date, form the basis of an antitrust claim independent of patent litigation outcomes. The Court should consider that: a) Patent litigation outcomes do not negate antitrust liability for the unauthorized use and profit from VoIP-Pal's innovations, b) Profits derived by the Defendants from deploying even invalidated claims of valid patents constitute antitrust violations, and c) Antitrust law should protect innovators from unauthorized use of their technology, irrespective of patent claim validity.

6. **Set a New Legal Precedent**: Establish a precedent that reshapes the intersection of patent and antitrust law by: a) Recognizing the distinction between patent validity and

antitrust violations in the use of innovative technologies, b) Considering the Defendants'
unauthorized deployment and profiting from VoIP-Pal's technology as an antitrust
violation, c) Strengthening protections for innovative companies against larger
competitors' anticompetitive practices, and d) Encouraging innovation by ensuring
creators benefit from their work, regardless of patent litigation complexities. These
requests aim to establish a fair and comprehensive framework for addressing the complex
interplay between patent rights and antitrust violations in the telecommunications
industry, ensuring that innovators like VoIP-Pal are protected from anticompetitive
practices while respecting the established processes of patent law and examination. This
approach offers a unique opportunity to balance intellectual property rights with fair
market competition, ensuring that technological innovations receive proper protection
under antitrust law.

7. **Address the Discrepancy Between Patent Expiry and Ongoing Antitrust Violations**:
Recognize and address the fundamental discrepancy between the 20-year patent expiry
timeframe and the ongoing nature of antitrust violations: a) Acknowledge that while
VoIP-Pal's patents may expire after 20 years, the Defendants' anticompetitive use of the
patented technology continues to harm the market indefinitely, b) Consider that the
Defendants have leveraged their market dominance to extract value from VoIP-Pal's
innovations beyond the patent protection period, constituting an ongoing antitrust
violation, c) Establish that antitrust remedies should extend beyond the patent expiry date
to address the long-term market distortions caused by the Defendants' anticompetitive
practices, d) Recognize that the 20-year patent term limitation should not restrict the
Court's ability to address and remedy antitrust violations that persist beyond this

timeframe, and e) Consider implementing remedies that account for the Defendants'
unjust enrichment and market advantage gained through anticompetitive practices, even
after the expiration of the relevant patents. This addition emphasizes the need for the
Court to consider the long-term impacts of antitrust violations that extend beyond the
limited lifespan of patent protections, ensuring that justice can be served even after patent
expiry.

## X. Other Relief

1. **Prejudgment and Post-Judgment Interest**: Award prejudgment and post-judgment
   interest on all damages awarded, at the highest rate allowable by law, to ensure full
   compensation for losses.

2. **Additional Remedies**: Grant any other and further relief that the Court deems just and
   proper to address the full scope of harm and rectify the anticompetitive and fraudulent
   practices of the Defendants.

3. **Appointment of a Special Master**: Appoint a Special Master to oversee the
   implementation of conduct remedies and ensure compliance with the Court's orders.

4. **Periodic Audits and Compliance Reporting**: Require Defendants to submit to periodic
   audits and compliance reporting by an independent third party approved by the Court.

5. **Consumer Education Programs**: Mandate the funding and implementation of consumer education programs to inform consumers about their rights and the true nature of Wi-Fi calling services.

6. **Public Acknowledgment**: Require Defendants to issue public notices, approved by the Court, acknowledging their anticompetitive conduct and detailing the remedies being implemented.

7. **Permanent Injunction**: Permanently enjoin Defendants from engaging in any future conduct that violates federal or state antitrust laws.

8. **Attorney's Fees**: Plaintiff is seeking reimbursement for its attorneys' fees and costs associated with pursuing this case.

## CLOSING

352. This case against AT&T, T-Mobile, Deutsche Telekom AG (Deutsche Telekom is the majority shareholder of T-Mobile US), and Verizon centers on dismantling their deeply entrenched, anticompetitive business practices. At the heart of this case lies the forced bundling of Wi-Fi calling with cellular services and mobile data with texting, which has perpetuated an unfair market dominance. The Defendants' practices have:

*a)* Suppressed competition by blocking standalone Wi-Fi calling and mobile data services.

*b)* Inflated prices through mandatory bundled services, often at the consumer's expense.

*c)* Hindered market innovation by barring new competitors.

*d)* Misled consumers about the true costs and benefits of these services.

353.   Unbundling these services is crucial for:

   *a)*   Empowering consumer choice by allowing tailored service selections.

   *b)*   Encouraging market competition, leading to lower prices and innovative offerings.

   *c)*   Promoting transparency in pricing, giving consumers clear cost insights.

   *d)*   Ensuring fair infrastructure use, particularly in the offloading of cellular traffic onto Wi-Fi networks.

354.   Plaintiffs request to the following action by the Court to provide remedy for these issues:

   *a)*   Issue injunctive relief to stop anticompetitive bundling.

   *b)*   Mandate the unbundling of Wi-Fi calling and mobile data from cellular services.

   *c)*   Require interoperability to allow third-party service integration.

   *d)*   Consider structural remedies, including potential divestitures, to restore competition.

   *e)*   Award damages to compensate for harm and deter future violations.

   *f)*   Ensure ongoing oversight to monitor compliance and maintain fair market practices.

355.   This case is not just about rectifying past wrongs but about setting a precedent that will foster a competitive, innovative, and consumer-focused telecommunications industry. The Court's decision has the potential to reshape the market, ensuring that it operates on principles of fairness, innovation, and transparency, ultimately benefiting consumers and encouraging technological progress. The American people and telecommunications subscribers worldwide are watching with hope.

Dated: August 17, 2024

Respectfully submitted,

/s/ Travis Pittman
Travis Pittman (D.C. Bar No. 1016894)
Local Counsel for Plaintiff
HOLMES, PITTMAN & HARAGUCHI, LLP
1140 3rd St. NE
Washington, DC 20002
(202) 329-3558
jtpittman@hphattorneys.com

Sean Parmenter (CA Bar No. 233144)
Lead Counsel for Plaintiff
PARMENTER INTELLECTUAL
PROPERTY LAW, PLLC
1401 21st St, Suite #10724
Sacramento, CA 95811
(925) 482-6515
sean@parmenterip.com

ATTORNEYS FOR PLAINTIFF